No. 15.—FRANCIS W. ROBERT and his wife, SARAH F. T. ROBERT, plaintiffs in error, *vs.* CHARLES WEST and ELIAS REID, trustees and executors, defendants in error.

[1.] Decisions made by the Courts in England, previous to the 14th day of May, 1776, are to be regarded as evidence of what the Common Law was which was adopted by our Statute of 1784, and not as being themselves the Law.  Hence, to be conclusive of any question, they should be clear and well settled.

[2.] Previously to May, 1776, there were of force in England, certain well recognized equitable principles, inherently pertaining to the power of a Court of Equity, over married women and their estates, by virtue of which such a Court might restrain the marital rights from attaching to the separate estate of a *feme sole*, upon her marriage at full age : or might restrain the Common Law rights of a second husband from attaching to property settled on a *feme covert* when the terms of the instrument creating the estate, provided that this should be done. These principles were adopted by our Statute, as a part of the Common Law.

[3.] Definition of the Rule in *Shelly's* case. It is a rule of Law and not of construction.

[4.] Rules of construction are—1. That the intention of the testator is to be gathered from a consideration of the whole will—from a comparison of differing terms; and effect given to this intention, if it can be done legally. 2. That his general intention must prevail over a particular intention. 3. If there be two repugnant clauses, which cannot be reconciled, the latter must prevail.

[5.] A bequest by a testator, to such child or children as his grand-daughter may have at her decease, no such children being then in life ; and a provision that "in case any such child or children should die during the life of its mother, leaving issue of their body, such issue shall, in such case, represent the parent" is not the limitation of a possibility upon a possibility, but is simply a gift to unborn children and grand-children.

[6.] Neither is this a limitation over, upon the death of an unborn child ; and therefore, objectionable because not upon a life or lives in being, and twenty-one years, with the usual period of gestation thereafter ; but it is a gift to the children and grand-children of testator's grand-daughter, living upon the termination of a life in being, viz : that of the grand-daughter.

[7.] Where, in one clause of his will, a testator made a bequest of personal property, upon the following terms : "in case my said grand-daughter, S. F. T. P. shall depart this life, leaving no issue of her body, or such issue die, leaving no issue before the interest aforesaid devised to her vests, and before my negro slaves have been sent to Hayti, as aforesaid, then I will and devise," &c. : *Held,* that this being a bequest of personal property, the phrase "leaving no issue", must be construed as having reference to issue *living at the death : Held* further, that this is shown by that portion of the context which limits the dying of the grand-daughter to a period before the interest devised to her vests, and before the slaves are removed to Hayti, &c.

[8.] Where a testator makes a bequest over to O and R and their children, *the heirs of the body of his grand-daughter,* (to whom, in the first place, he had given the property, *failing ;* and in the same connection, again expresses the purpose that the property shall go to and be enjoyed by the first named persons, in case his grand-daughter *shall die without heirs of the body,*

*as aforesaid: Held,* that these are terms which are usually and technically employed to create an estate tail.

[9.] These terms are influenced and controlled, when referentially construed, by the following super-added or associated terms, circumstances and considerations: 1. By the words already quoted, which import a dying without issue living at the death. 2. By terms, in a former part of the will, which give the property in trust, the interest to be paid to testator's granddaughter during life, and provide, that " after the decease of the said S. F. T. P. (his said grand-daughter,) the principal, (of said property,) I further will and devise, to such child or children as she may have, to him, her or them, and to their heirs forever", which terms contain clear and definite words of purchase. 3. By the provision, that the children of a deceased child of his grand-daughter, shall take in the place of its parent. 4. By the fact that the bequest is of personal estate. 5. By the fact that estates tail are prohibited in Georgia, and presumptions do not favor them. 6. By the consideration, that to construe this will so as to hold that it creates an estate tail, will be to defeat, entirely, the intention of the testator, while a contrary construction, to some extent at least, effectuates it.

[10.] In view of such terms and considerations, a bequest of this personal property over, in the same will to C and R and their children, is a gift of the estate absolutely, to C and R; the word children being used as synonymous with heirs.

[11.] Where the husband has no interest in the separare estate of his wife, the better practice is that he should not be joined with her in a bill against trustees, requiring them to account for the same, but that her suit should be instituted by *procheine ami.*

[12.] Where a husband has been thus joined in a bill, and as a party complainant, for the purpose of seeking to enforce his marital rights against an estate left to his wife's separate use ; and in the opinion of the Conrt, he is not entitled to the relief he seeks, and ought not to have been made a party complainant to the bill: *Held,* that the Chancellor should not dismiss the bill, but direct an amendment, by removing the husband's name—substituting a *procheine ami* and modifying the bill according to the exigencies of the case.

In Equity, in Houston Superior Court. Decision on demurrer, by Judge POWERS, October Term, 1853.

Jacob Wood, of the City of Darien and county of McIntosh, departed this life in the year 184–, having first made and published his last will and testament, bearing date the 11th day of January, 1840, as follows :

GEORGIA, McINTOSH COUNTY.

In the name of *God*, amen.

I, Jacob Wood, of Darien, being of sound and disposing mind, and being desirous of settling my worldly affairs, do make and publish this my last will and testament, hereby revoking and making void, (after this is duly executed,) all former wills by me at any time heretofore made.

*And First*—I surrender my soul to my God, and my body I direct to be placed in my vault in the Savannah burying ground; and as to such worldly estate as it has pleased God to give me, I dispose of the same as herein directed:—

I direct all my just and legal debts to be paid. All my estate, both real and personal, I do hereby give, devise, and bequeath unto Doctor Charles West, Senior, of Houston county, Elias Reed, Esqr., of Savannah, Doctor James Troup, of McIntosh county, and their heirs and assigns, and to the survivor of them, and his heirs and assigns, to, and upon, and for the uses, trusts, interests and purposes, and with and subject to the powers, provisions, conditions and limitations hereafter mentioned and expressed of and concerning the same, that is to say, to have and to hold all and every part and parcel thereof, in trust, to carry into effect the following intentions and objects, viz: by the sale of my real and personal estate, (all my negro slaves expressly excepted,) to raise the sum of Fifty Thousand Dollars; but this is to be done with as little sacrifice as possible, and if all my other real and personal estate, (my negro slaves excepted,) will not complete that sum, or any balance that may not be invested in Boston real estate in my life-time, then all my plantation slaves are to continue to plant corn and cotton on my two tracts of land on Big Creek in Pulaski and Dooly counties, and bought of Collins and Scarborough, until by their annual labor a sufficient sum is raised to make up the aforesaid sum of fifty thousand dollars, and when that sum or any balance that I may leave myself uninvested, is under the control of my said Trustees—

(*No.* 1.) *I do give, devise and bequeath unto my grand-*

daughter, Sarah Frances T. Pierce, all the annual interest thereon, for and during her natural life—subject, however, to the conditions hereinafter named, free and clear of the control or debts of any husband or husbands that she may hereafter marry, to be paid to her annually, and (No. 2.) the principal, after the decease of the said Sarah Frances T. Pierce, I further will and devise to such child or children as she, the said Sarah Frances T. Pierce, may have, to him, her and them, and to their heirs forever.

And I will and direct that the aforesaid capital sum of fifty thousand dollars, to be raised, if possible, from my other real and personal estate, (my negro slaves excepted,) but if that amount cannot be raised from my other real and personal estate, (my negro slaves excepted,) then I will and direct that the balance be made up of the annual labor of my negro slaves, in manner as before mentioned, and until the aforesaid capital sum of fifty thousand dollars is raised in manner as aforesaid, I give and devise to the said Sarah Frances T. Pierce, the sum of eight hundred dollars a year, until she arrives at the age of eighteen years, or marriage, to be paid her semi-annually, out of the proceeds of the labor of my negro slaves on Big Creek, as aforesaid, for her maintenance and support, and for her education, which I desire may be of a religious, useful and elegant character; and I further devise to her, all my plates, during her life, and after her decease, to go to her children. And after the aforesaid sum of fifty thousand dollars is raised, and laid out at interest, my will is, that so much of the balance of the interest arising therefrom as shall accrue, after my said grand-daughter's annuity is paid, and I will and devise may annually be laid out at interest. (No. 3.) And I further will and devise to my said grand-daughter, Sarah Frances T. Pierce, for and during her natural life, all the annual interest accruing on the aforesaid capital of fifty thousand dollars, on her, my said grand-daughter arriving at the age of eighteen years, or marriage, but to be free, and clear of and from the control of and debts of any husband or husbands that she may marry; (No. 3.) and after the decease of my said grand-

*daughter, Sarah Frances T. Pierce, I will and devise the whole of the capital of fifty thousand dollars, and all other accumulating sums, to such child or children as the said Sarah Frances T. Pierce may have, to him, her and them, and to their heirs forever. (No. 4.) And in case any such child or children should die during the life of its mother, leaving issue of their body, such issue shall, in such case, represent the parent.* And for the purpose of carrying out the aforesaid trust into execution, I do hereby vest in my aforesaid trustee or trustees for the time being, full power and absolute authority to dispose of all my real and personal estate, (my negro slaves and all their issue expressly excepted,) together or in parcels, by public or private contract, as shall be most judicious, for the best prices, for money, or on a reasonable credit, not over three years, on legal interest, securing the payment by bond, personal security and mortgage, and respectively to execute all necessary deeds for the conveyance of the same. And no trustee shall be liable for the acts of the other, but for his own individual receipts; and that all moneys which shall arise by or from such sales, as aforesaid, shall be termed a part of my personal estate, and be applied as heretofore or hereafter directed, and that all investments therefrom shall be made on clear unincumbered real estate in the city of Boston, in the State of Massachusetts : I mean on loan, security, bond and mortgage, on real estate, made at one-fourth less than its appraised value, with such interest as can be obtained, and not in investments by fee simple purchase, especially the aforesaid specific sum of fifty thousand dollars, and agreeably to the laws of that State. After my said trustee or trustees have realized the sum of twenty-five thousand dollars, and as soon as possible, have invested the same in real estate in Boston, as aforesaid, and have five thousand dollars in cash, on hand, and other twenty-five thousand dollars, or any amount over that sum, in secured debts, that can be reasonably depended upon to make up the aforesaid capital of fifty thousand dollars, and drawing interest thereon, here and in Boston, so that my said grand-daughter, Sarah Frances T. Pierce, may receive her an-

nuity as aforesaid, then I will, devise and positively direct, that all my negro slaves, together with all their future issue and increase, that I may own at the time of my death, be shipped and sent to the north east side of the Island of Hayti, (San Domingo,) to occupy, cultivate, and plant for my use, land that I have bought at a place between Puerto-de-Punta, (Port of Plati,) and the harbor of Carboneta, near the residence of Mr. George Kingsley; and I do hereby will and devise the sum of five thousand dollars, to pay the expenses of their removal; and I do hereby nominate Mr. Zess Kingsley, of Florida, to aid in superintending and directing their removal.

And I do hereby bequeath and devise to the acting trustee the sum of one thousand dollars, and to each of the other trustees, unto this my will the sum of five hundred dollars, to be paid on the departure of my negro slaves to Hayti, as aforesaid, and not till then.

(*No. 5.*) *In case my said grand-daughter, Sarah Frances T. Pierce, shall depart this life, leaving no issue of her body, or such issue die, leaving no issue before the interest aforesaid devised to her vests, and before my negro slaves have been sent to Hayti as aforesaid, then I will, devise,* and positively direct that all my negro slaves, together with all their future issue and increase, be immediately shipped and sent to the Island of Hayti in manner as before directed. In such case I then give, devise, and bequeath the residue of all my estates, (my negro slaves and their issue and increase excepted,) to the President and trustees of Franklin College, in the State of Georgia, and their successors in office, on the following special trusts, as follows, viz: That the interest on one half of the said residue of my estate be annually and steadily applied to the erection and maintenance in said College of a "Professorship of Law, and Political Economy," and forever be continued for that purpose; and further, I will that the interest on the other half of the said residue of my estate be expressly invested, and annually to the erection and maintenance of "a Manual Labor School," for the benefit expressly of the poor children of the counties of McIntosh, Wayne, and Liberty. And that the said Manual

Labor School site shall be selected in a healthy situation on the Upper Sand Hills of McIntosh County, and that the care of its erection, establishment and superintendance be confided to the President and trustees of said Franklin College and their successors in office. They are required to cause annual exhibits of its situation and details to be laid before the Senatus Academicus of this State annually, and that the said President and trustees, when the said residue of my estate becomes vested in them, do cause the same to be laid out in some permanent fund, on which the interest can be relied on to be paid in gold or silver when such bequest falls to them. I will that my trustees pay it accordingly to them, and I do constitute the Judge of the Superior Court of the Eastern District, and the Justices of the Inferior Court of the Counties of McIntosh, Wayne and Liberty, and their successors in office, the permanent visitors of said Manual Labor School; and I further impose it as a duty of the gentlemen who may occupy the Chair of the Professorship for the time being, annually to inquire into and report to the Governor of the State, and his successors · in office, the situation, standing and administration of said Manual Labor School.— Further, it is my will and pleasure, that my said trustee or trustees shall, with the consent of my said grand-daughter, and the approbation of the Judge of the Eastern District, have the power of appointing other trustee or trustees in the place of those who may either die, or resign, or remove, and that each trustee shall only be liable for his own acts in the premises ; and it is further my will, that the acting trustees, for carrying into full effect the provisions of this my will, and the duties imposed by it, be allowed ten per cent. on the legal commissions allowed by law. I further will, that on my death, the following house servants be not put in the field, but at a reasonable rate, be allowed to hire their own time, to wit: James, Priscilla, and her three children, Jane, Robert and James ; Will, William, Francis, and Charlotte, her mother, and Lewis, the son of William, and all moneys and property not above mentioned, I will shall follow all the provisions and devices of the aforenamed fifty thousand dollars.

I hereby appoint my estimable friend, Nathaniel Goddard, Esq., of Boston, and his executors, the guardians of my said grand-daughter, to educate and take the sole care of her person until she arrives at the age of fourteen years; and I further wish her to continue the appointment until she is twenty-one years of age, or until marriage; if the laws of Massachusetts will not allow me to do the first or both, in such case, I then suspend all pecuniary advances and support, until Mr. Goddard is allowed to act, until my grand-daughter arrives at the age of twenty-one, or marriage—this provision is made to prevent any of her father's relatives having anything to do with my money or her education. I further appoint my esteemed friend, the said Nathaniel Goddard, Esq., as the agent and trustee, to receive and disburse to my grand-daughter semi-annually, under this my will, her said allowance for support and education, until she arrives at the age of eighteen years or marriage.

(*No.* 6.) *Should a case occur under this my will, to ascertain who are the heirs of Mrs. S. C. E. Pierce, or her daughter, Sarah Frances T. Pierce, and those of their bodies failing, I nominate Mrs. Kitty Crawford, wife of William H. Crawford, and her brother, Mr. Redding, of Middleton, in the State of Delaware, and their children as such heirs, they being my blood-kin, and also of my daughter and grand-daughter, on my side. And further, it is my will, and I do hereby forever exclude all and every of the connexions, relatives and heirs in any shape, of Marcus J. Pierce, deceased, the late husband of my said daughter, S. C. E. Pierce, from ever inheriting or claiming or controlling any property or estate of my grand-daughter, Sarah Frances T. Pierce, and who may claim the same as next of kin, on her father's side, and also of any right to control or manage her person, during her minority, as it is my will and fixed purpose, that all such property as my grand-daughter shall and may receive by this will or through her mother's blood, in case she shall die without heirs of her body as aforesaid, shall only go to and be inherited by her mother's heirs, as above designated.*

And further, it is my will, that, should the laws of Massachusetts give the care of her person, and the education of my said grand-daughter, to the nearest of kin on the part of her father, in such case, I hereby suspend all pecuniary support, either for education or maintenance, until she is married or twenty-one years of age, and give the aforesaid allotted amount to Mr. Crawford and Mr. Redding as above, until her education and person is confided to the friend above mentioned.

Placing the greatest reliance on their friendship, character, and uprightness, I hereby nominate, constitute and appoint my trustees aforesaid, executors of this my last will and testament, and may the Great *God* prosper their acts.

In witness whereof, I, Jacob Wood, have, to this my last will and testament, contained in two sheets of paper, and written on this six preceding pages, set my hand and seal, in manner following: that is to say, to the first six pages, in the margin of each page, I have set my hand, by subscribing the same with my name, and have set my hand and seal at the bottom of this last page, this eighteenth day of January, in the year of our Lord one thousand eight hundred and forty-four.                                                    JACOB WOOD.

Signed, sealed, published and declared, by the above named Jacob Wood, as, and for his last will and testament, in the presence of us, who, at his request, and in his presence, have subscribed our names as witnesses thereunto. We have likewise done to a duplicate of the above written will at the same time.

FRANCIS E. BOND, &#125;
J. E. TOWNSEND, &#125; J. I. C. M. C.
PDE. LECHARTIER, &#125;

In 1850, the said Sarah Francis T. Pierce, in said will mentioned, having already arrived at the age of twenty-one, intermarried with Francis W. Roberts.

To the April Term, 1853, of the Superior Court of Houston county, the residence of Dr. West, Robert and his wife brought their bill for "discovery, account and relief," against Dr. West

and Elias Reid, as trustees and executors under the will, Dr. Troup having refused to accept either the trusteeship or executorship.

The bill alleged, that on her marriage, Mrs. Robert became absolutely entitled to the sum of fifty thousand dollars, under that clause of the will which bequeathed to her "the interest on the said sum of fifty thousand dollars, for and during her natural life, to take effect on her arrival at the age of eighteen years or marriage".

The bill proved that West and Reid "may fully account with complainants of and concerning their trusts under the will; and that they be decreed to account fully with complainant, Robert, and to pay over to him all the estate to which his wife is entitled under said will; and also for general relief.

To the bill the defendants filed a general demurrer.

The Court sustained the demurrer and dismissed the bill.

To which decision of the Court, counsel for complainants excepted, alleging that the Court erred—

1st. In sustaining the demurrer and dismissing the bill.

2d. In deciding that the bequest by the testator, Jacob Wood, to his grand-daughter, Sarah Francis T. Pierce, of the annual interest of $50,000, which his trustees were directed to raise, was not a gift of the capital sum so bequeathed, and from which the said interest was to arise.

3d. In deciding that under the said bequest, by the said testator, to his said grand-daughter, she had only a usufructuary interest for life, and no legal estate therein.

4th. In deciding that under the said bequest to his grand-daughter, she took an estate for life only.

5th. In deciding that the trust created by said will was a continuing trust, and subsisted after the said Sarah Francis T. Pierce had attained the age of eighteen years, and was married.

6th. In deciding that the provisions of said will did not create an estate tail, or what, in relation to realty, would have been such an estate.

7th. In deciding that the limitation over to Kitty Crawford

Robert and Wife *vs*. West and Reid.

and her brother, Mr. Redding, was not on an indefinite failure of issue, but was to take effect on the death of Sarah Francis T. Pierce, without children or the descendants of children living at her death.

8th. In dismissing the bill of complainants, for the reason that Francis W. Robert and Sarah Frances T. Robert, were joined together as complainants therein.

9th. In refusing to allow an amendment of complainant's bill.

10th. In deciding that the legacy bequeathed to Sarah Francis T. Robert by the testator, Jacob Wood, was her separate property.

And upon these several exceptions, error has been assigned.

McDONALD and BERRIEN, for plaintiffs in error.

LAW & BARTOW and NISBET, for defendants in error.

*By the Court.*—STARNES J. delivering the opinion.

[1.] Our first step in this case has been, to ascertain the *character* of the estate taken by the complainant, Mrs. Robert, under the will of her grandfather, with reference to the marital rights of the husband—that is to say, whether or not the interest vested in her is to be enjoyed as her separate estate; and this inquiry has not been unattended with difficulty, and has required careful and cautious consideration.

While endeavoring to determine the influence which the principles of the Common Law are to have in the consideration of this subject, we have recognized the correctness of the position, that we should look to that Law as it stood before the 14th day of May, 1776; and so of those principles of Equity, which are regarded as forming part of the Common Law. We have also recognized the rule, with a proper qualification, that in the effort to determine what was the Common Law at that period, we should consult the decisions of Courts in England, previously made; and that such decisions are to be regarded as the

proper exponents of the Common Law, as it was adopted by our Legislature. The qualification on which we insist, is this : These decisions are to be received as evidence of the Law, and not the Law itself ; and hence, to be conclusive of any question, they should be clear and well settled. A mere preponderance, or even a strong current of decisions upon a given point, at that period, is not decisive, if, notwithstanding, in the opinion of the Court, the question was still *lis sub judice.* In such event, a Court in our State is free to adopt a different view, if it believes the Law was otherwise at that time.

[2.] An examination of the subject has satisfied us that, without doubt, the decisions in England, upon this point, previous to our Revolution, had, for the most part, gone upon the Common Law principle, that property given by deed or will, directly, or to trustees, for the separate use of a *feme sole june mariti,* passed to her husband on her marriage at full age. And if we were satisfied that these decisions stood as the well established evidence of the Law, at that time, in cases of separate estate, we should feel it our duty, without pause, to follow their guidance. But we find that different views were then, and previously, entertained by some Courts, and the question was, by no means, clearly and definitely settled.

We may recur to as early a period as the reign of *Charles II.* and the time of Lord Chancellor *Nottingham,* and we will find the doctrine held, that a Court of Equity in England, in a case of separate estate, will decree protection as against the marital rights, although such estate had vested in the *feme* at a time when she was *sole.* This period is, perhaps, a fit starting point for our examination, for it is known that, under Lord *Nottingham's* administration of Chancery, that branch of Jurisprudence first assumed in England, the form and shape of a regular and scientific system. Lord *Campbell* says of this Chancellor, that " he had the sagacity to discover that Equity might be moulded into a noble code," and that " he laid the foundation for being a great Equity lawyer, by a profound knowledge of the Common Law." (3 *Lives of Chancellors,* 312.) Chancellor *Kent* says of him, that " from his time,

Equity became a regular and cultivated science." (1 *Kent Com.* 492) and Judge *Story* observes, that "he has been emphatically called *the Father of Equity.*" (1 *Story's Eq. Ju.* 46.)

This great Judge, in the case of *Doyly vs. Perfull*, (1 *Chan. Cas.* 225,) decided that, "if a term were assigned expressly upon trust for the separate use of a *feme*, the marital rights, in that case, should not prevail "; and he followed up this decision by a similar opinion, in *Sir Edward Turner's* case. In that case, an annuity had been conveyed to trustees for the separate use of a lady, upon her marriage. The husband afterwards died, and she intermarried with Sir Edward Turner, who subsequently disposed of the annuity. The question was, as the second husband had not bound himself by any agreement, whether or not he could dispose of this annuity by virtue of his marital rights? Lord *Nottingham* was of opinion, "that as the annuity had been settled expressly for the lady's personal use, the second husband was barred". And he assigned as a reason, that unless this be the law, "no man shall be able to provide for wife and children". (1 *Chan. C.* 307.) It is true, that this decision afterwards (in 1681) was reversed by the House of Lords. According to the report, or rather memorandum, of that case, in (1 *Vern. R.* 7,) and what Lord *Hardwick* said of it, in *Jewson vs. Moulson*, (2 *Atk.* 421,) that reversal was placed upon the ground, that "the same rule of law must prevail in Equity, as in Law; that as the husband might dispose of the term, so he might of the trust, and that therefore, the term was well passed away, and the husband might dispose of it ".

Thus, this hereditary Court, at a time when its Judges, by Divine right, as a general rule, were very imperfectly educated in a knowledge of human rights—at a period, indeed, when few Judges in any Court, as we have seen, were educated in those rights which it was the peculiar province of a Court of Equity to administer, on these unsatisfactory grounds, overruled the judgment of that wise and learned Magistrate, who had devoted a life to the study of these things.

Subsequently, in the case of *Hunt vs. Pitt* (1 *Vern.* 18,) Lord *Nottingham* acquiesced in this decision; not that he thought it right, (for he said he "wondered at that resulition," and somewhat touchingly complained that the effect of such a decision would be to render it "almost impossible for a man to provide for a child, but that it shall be subject to the disposal of an extravagant husband,") but because it was his duty; and as he said, "there must not be one Equity above stairs in the House of Lords, and another below, in Chancery".

I have dwelt somewhat upon this case of *Sir Edward Turner*, because the history of this question shows that this case influenced the case of *Tuden vs. Samyne*, (2 *Vern.* 207,) and these two gave direction and character to what had been held on this subject, in England, previous to our Revolution. *Moulson vs. Jewson*, (2 *Atk.* 421;) *Tullett vs. Armstrong*, (4 *Myl. & C.* 390: *Lewin on Trusts*, 79.)

Of these two cases, Lord *Cottenham* says, in *Tullett vs. Armstrong*, (4 *Myl. & C.* 394,) that they were inaccurately reported, and that this point was not argued. But I care not how this may be. If it appear from what is reported, that they proceeded on wrong principles, and we find that the question was in such a state, on the 14th of May, 1776, as will admit of our considering it open for adjudication, we are not to be controlled by these cases. That it was not put by them upon a settled and satisfactory footing, we think is evident, from the following considerations:

After these cases were decided, and before the period of our Revolution, the practice of settling estates upon trustees for married women, to be protected against future husbands, seems to have continued, as appears from very old forms of conveyancing of this kind, appearing in *Horseman's Precedents & Wood's Conveyancing*. These are referred to, in *Davies vs. Thorneycroft*, (6 *Sim.* 420,) as showing "that the practice of the profession, without any variation", had proceeded on the idea, that "it was lawful to give property to the separate use of a woman, married or unmarried". And touching these, the Master of the Rolls, Lord *Langdale* says, in *Tullet vs.*

*Armstrong*, when the case was before him, (1 *Beav.* 31,) that "this doctrine appeared to him as the result of the authorities and of the constant practice of conveyancers, which great and eminent Judges have considered to be no mean evidence of the law".

The dicta and decisions of eminent Judges, pronounced presently after our Revolution, but so near to it as to be suggestive of what was the state of the law on this subject, at that time, encourage the idea that such estates would have been protected in Equity at that period.

In the case of *Bealle vs. Dodd*, (1 *Durnf. & E.* 193,) even the Court of King's Bench, in 1786, recognized the principle that a gift or devise may be made to the separate use of a married woman, which shall be independent of the control of a future, as well as a present husband. By parity of reasoning, it sanctions the doctrine that such a conveyance may be made to a *feme sole* of full age, and protected against the marital rights incident to a subsequent coverture.

In the case of *The Countess of Strathmore vs. Bows*, (1 *Ves. Jr.* 22,) Lord *Thurlow*, in 1789, lends countenance to this doctrine. And even afterwards, in England, down to the decision in *Tullett and Armstrong*, the question was treated as one not finally settled. (*Lewin on Tr.*)

Thus it is, we are impressed with the belief that this question was not clearly and definitely settled in May, 1776, upon the basis of Sir Edward Turner's case. But, on the contrary, that there were, at that period, certain vital equitable principles of legal and binding force in England, because, inherently pertaining to the power of a Court of Chancery over the estates of married women, by virtue of which the universality of the Common Law might be restrained, and an estate, such as we have been considering, supported.

As early as the reign of *James I.* we have notices of the Court having entertained jurisdiction to secure property to the separate use of a married woman, that had been given to her to be so enjoyed. (*Tothill, p.* 158.) Shortly afterwards,

in the reign of *Charles I.* this is said to have become quite common. (*Tothill*, 161. *Car.* 1.) We have seen to what extent this power of the Court had been, and, in the opinion of Lord *Nottingham*, might rightly be carried in the reign of the second *Charles.*

Again : Long before our Revolution, and as early as the reign of *Charles I.* the right of a Court of Equity, to restrain the Common Law rights of the husband, so as to prevent him from recovering a legacy given to his wife, until he had made a competent provision for her, was acknowledged. (*Tothill*, 179. *Car.* 1.)

The right to do all these things, proceeds, in our opinion, from precisely the same source, viz : the power of a Court of Equity, as representing the *sovereign authority*, over married women, and their estates. The separate estate of a married woman was thus, as it were, the creature of a Court of Equity; and that Court had in this way, (in the language of Lord *Cottenham*,) acquired the right "to model and qualify an interest in property, which it had itself created, without regard to those rules which the Law has established for regulating the enjoyment of property in other cases". *Tullett vs. Armstrong* (4 *M. & C.* 393.) And in this connection, he adds that "when this Court first established the separate estate, it violated the laws of property, (that is, it restrained their universality,) as between husband and wife, but it was thought beneficial, and it prevailed".

Upon this principle, which is, in our opinion, thus shown to have been in force in England on the 14th of May, 1776, and consequently, adopted as the Law in our State, a Court of Equity, by its decree, may restrain the marital rights from attaching to an estate which has been settled for the separate use of a *feme sole*, upon her marrying at full age ; and may also restrain the Common Law rights of a second husband from attaching to property thus settled on a *feme covert*, where the terms of the instrument creating the estate, provide that this shall be done.

The exigencies of a refined civilization, among all enterpris-

Robert and Wife *vs.* West and Reid.

ing and commercial people, like ours, loudly call for such a rule; and we are pleased that we are enabled, rightly and properly, as we think, to place the decision of this question upon a principle which will enable a parent, in our State, to make a provision for his daughter, which can be guarded against a husband's extravagance or improvidence.

With this view of the point made, we of course hold that Mrs. Robert, under those clauses of her grandfather's will, which are italicized in the copy to this opinion annexed, and marked Nos. 1 and 3, took a separate estate in what was conveyed to her, to which the marital rights of the complainant, Francis W. Robert have not attached.

[3.] We have next endeavored to ascertain the *quantity* of the estate taken by Mrs. Robert, so far as the same is influenced by those terms of the will which it is insisted would create an estate tail by virtue of the Statute *De donis,* &c. were the bequest of real property.

If the tenor of these terms be such as would create an estate tail, for the purposes of this investigation, we assume the correctness of the position, that the bequest of the interest or income of the property, has drawn after it the principal, and an absolute estate has vested in the first taker, Mrs. Robert.

We incline, however, to think that if by the terms of this will, a separate estate in Mrs. Robert was intended and provided for, that whatever might be the quantity of interest taken, whether a life-estate in the income, or an absolute estate in the principal, (because a fee tail was contemplated,) in the light of our decision just made on the first point in this case, a Court of Equity would protect such separate estate from the marital rights. This view would, perhaps, be decisive against the husband's right to the decree he seeks in this case. But we care not, formally, so to decide, inasmuch as other interests and rights depend on this question of entail; and it is, on this account, necessary that we should announce the opinion which we entertain of the same—which opinion will otherwise dispose of the question.

We have, therefore, anxiously sought an answer to the fol-

Robert and Wife *vs.* West and Reid.

lowing questions: Is this bequest expressed in terms which, by the Statute *De donis*, would create an estate tail, if the conveyance were of real estate? What is the import of the whole instrument, when all its terms are considered?

These questions, it has been argued, involve the rule in *Shelly's* case, on which so much comment has been made; a rule, in itself simple enough, but which, from the conflicting results, and the obscurely technical character of the many cases in which it has been discussed, is sometimes regarded as a sort of monster, with frightful presence, confined in a worse than Cretan labyrinth of intricate construction and tedious technical learning.

That rule amounts only to this: that where an estate of free-hold is limited to a person, and the same instrument contains a limitation, mediate or immediate, to his heirs or the heirs of his body, the word *heirs* is a word of limitation; that is, the ancestor takes the whole estate comprised in this term. Thus, if the limitation be to the heirs of his body, he takes a fee tail; if to his heirs general, a fee simple. (2 *Jarm. on W.* 241, and cases there cited.)

It is obvious that this rule, which is said to be a rule of Law, and not of construction, (2 *Jarm.* 241,) fixes nothing except that the use of certain words, in a certain way, will be held to indicate an intention to create an estate tail, and of certain other words, an intention to create a fee simple. When the terms used are heirs of the body, alone, or where they are heirs general, the rule easily and plainly performs its office; but difficulty begins, when words are employed which are assumed to be only equivalent to these terms; or where such words, or words supposed to be similar in effect to each of these terms, are used in the same instrument. Then it is that resort must be had to referential construction; and the task of fixing an intention for the testator, needs more a rule of construction than of Law.

Such is precisely the kind of case we are now considering; and it becomes necessary for us, in order to determine the correct import of this will, to invoke the aid of certain rules of construction with more anxiety than the rule in *Shelly's* case, of which we shall say no more.

[4.] These rules of construction are—1. That the intention of the testator is to be gathered from a consideration of the whole will—a comparison of different terms, and effect given to this intention, if it can be done legally.   2. That his general intention must prevail over a particular intention.   3. If there be two repugnant clauses, which cannot be reconciled, the latter must prevail.

It is not pretended that all the terms used in this will, plainly and explicitly import an intention, on the part of the testator, to create an estate tail.   Indeed, it was argued for the complainants that there was some repugnance in these terms; but it is insisted that certain clauses, which come after a passage of a different tenor, clearly contemplate an indefinite failure of issue, and a limitation to a particular class of heirs; and that these clauses must control any other words in the will, of a different import.

Confessedly, then, here are contrarient terms, and no manifestion of intention, by apt words, and none other, to create an estate tail.   To such an extent is this true, that the learned counsel who concluded the argument for the complainants, felt himself justified in denominating this will, (as a manifestation of the testator's intentions,) a *mare ignotum*, by which that distinguished counsel designed to say, no doubt, that this instrument was, as it were, a sea or expanse of uncertain, if not of unknown meaning.

Exploring this instrument, which was thus admitted to be uncertain in its import, we began, by looking to those features which it is said denote that this bequest was intended for a particular class of heirs, and have endeavored to give full effect to these.   We observed, that by his will the testator plainly desired to make his grand-daughter and her posterity the chief objects of his bounty, and that this property should not go to the paternal kindred of that grand-daughter, in any event; that it involves a bequest to the unborn children of unborn children; that it uses terms in one place, which are sometimes regarded as contemplating an indefinite failure of issue;

and that in another, the heirs of the body of the grand-daughter are specified, as the class of heirs whom the testator desired to receive and enjoy the property conveyed.

[5.] The first feature just mentioned, it is thought, serves to characterize the other terms used ; and as such, we have given it full effect. The second, a bequest to the unborn children of unborn children, is contained in the clause of said will, marked No. 4, in the margin of the copy to this opinion annexed and italicized. It is urged that this is a bequest which contemplates a limitation upon a possibility too remote ; that is to say, a possibility upon a possibility. It is true, as Sir *Edward Coke* tells us, that " a possibility upon a possibility, is never admitted by intendment of law". But we are informed that this expression is not to be understood in too large a sense. (1 *Fearne*, 251, *note*.) There may be cases where this is not allowable, because of the uncertainty in the terms ; but a bequest to the unborn children and grand-children of one in life, is not marked with this uncertainty, and is in no wise objectionable. *Routledge vs. Dorril*, (2 *Ves. Jr.* 357,) Such is the character of the bequest in this case.

[6.] Neither is this a limitation over, upon the death of an unborn child ; and therefore objectionable, because not upon a life or lives in being and twenty-one years, with the usual period of gestation thereafter. On the contrary, it is a limitation over to the children and grand-children of testator's grand-daughter, who may be afterwards born and be living at the time, upon the termination of a life in being, viz : the life of the grand-daughter, now Mrs. Robert.

[7.] The third of these features, regarded as indicating an intention to create an estate tail, is that which is italicized in the copy of the will hereto annexed, and marked in the margin No. 5, in which the testator directs a certain disposition of his property to be made, "in case his grand-daughter shall depart this life, leaving no issue of her body, or such issue die, leaving no issue", &c.

It should be remembered, just here, that this is a disposition of personal property, and that in England even, terms import-

ing an indefinite failure of issue, yield, as to personal estate, "readily to expressions and circumstances in the will, tending to confine them to the restricted sense of issue living at the death", &c. (2 *Jarm*. 427. *Fearne Con. Rem*. 471.)

One of these expressions is, the phrase " leaving no issue" ; with respect to which, the settled distinction is, that as applied to real estate, it means an indefinite failure of issue. But, " in reference to personal estate, imports a failure of issue, *at the death*."

· This rule applies, " even where the real and personal estate are comprised in the same gift". *Forth vs. Chapman*, (1 *P. Wm*. 663.) And see, 2 *Jarm*. 418, 419, and cases there cited.— The Courts have gone so far, indeed, in some cases of personal property, where they thought the intention of the testator · warranted it, as to supply the word "leaving". (2 *Jarm*. 419; note.)

The case we are considering, is a disposition of personal pro-·. perty ; and the passage of the will under review, contains the phrase, " leaving no issue", &c. If, in England, this would' import a failure of issue *at the death*, in such a case, it will' certainly have this effect in Georgia; and, therefore, the clause· does not contemplate an indefinite failure of issue, and must be held to have reference to the children and grand-children of Mrs. Robert, living at her death. But this is further man- fested, by that portion of the context which limits the dying of the grand-daughter without issue, to a period "before the in- terest devised to her vests"—that is to say, before she was eighteen years old, and before the negro slaves of the testator had been sent to Hayti, &c.

[8.] It is certainly true, that the terms used in that clause of the will which is italicized, and marked in our copy as No. 6, contain expressions whose legal signification is such as is usually and technically employed for the creation of an estate- tail. These words direct, that the estate shall go over to Mrs. Crawford and Mr. Redding, and their children, the heirs of the body of the grand-daughter, and of her mother failing;

and express the fixed purpose, that the property shall go to, and be enjoyed by the first named persons only, in case his grand-daughter shall die without heirs of her body.

[9.] These terms are repugnant to other clauses of the will. They are last employed, and would, undoubtedly, be held to have the effect of expressing an intention to confine the bequest to a particular class of heirs, designed to take in succession, in exclusion of heirs general, if these other clauses were not in the nature of words of explanation—if there were not other terms and circumstances connected with this bequest, which qualify and control the clause under consideration. These terms and circumstances, in our opinion, are:

1. The passage of this will, on which comment has been already made, marked in the margin of the copy hereto annexed as No. 5. This clause, as we have seen, as connected with a bequest of personal property, clearly and definitely expresses an intention, that the issue who are to take after Mrs. Robert, are those whom she shall leave living at her death—that is to say, her children and grand-children. 2. The terms which stand forth conspicuously in the first disposing clause of the will, and are contained in the passage marked No. 2 in the copy, and also in the passage marked No. 3. In these, the testator gives the principal of the property, "after the decease" of his grand-daughter, "to such child or children as she, the said Frances T. Pierce may have, to him, her and them, and to their heirs forever". It is true, as has been urged, that the word "children" is not necessarily a word of purchase. Though this be its general character, it may, nevertheless, be controlled by other and repugnant words in a will. But there are words in immediate connection with it here, which are conclusive of its import, as a word of purchase.—First, the phrase, "after the decease", (twice here used,) which, in a bequest of personal property, will be held to have reference to a dying without issue living, at the death of the first taker. *Pinbury vs. Elkin,* (1 *P. Wm,* 563.) 2 *Vern.* 758. *Wilkinson vs. South,* (7 *Burn. & E.* 553.) *Trotter vs. Osnold,* (1 *Cox,* 317.) Next, the words "to him, her and them,

Robert and Wife *vs.* West and Reid.

and to their heirs forever", which are technically significant of an intention to create an absolute estate; and are appropriate words to be applied to these children, as to the stock of a new inheritance.

3. The terms "in case any such child or children should die during the life of its mother, leaving issue of their body, such issue shall, in such case, represent the parent", which immediately follow these just mentioned, have a like significance. If the object had been to create an estate tail, as issue *ad infinitum* is included in such an estate, it would seem that a necessity for this provision, as to the children of deceased children, would not have presented itself to the mind of the testator.

4. The fact that this is a conveyance of personal estate, relaxes the rigorous technical significance of words commonly used to create an estate tail, and renders them more accessible to referential construction; for, "in regard to personal estate, it seems to be clear, that words denoting a failure of issue, following a bequest to *children*, refer to the objects of that gift". *Doe d. Lyde vs. Lyde,* (1 *D. & E.* 596.) *Malcolm vs. Taylor,* (2 *Russ. & M.* 416. 2 *Jarm.* 362.) And there is "no valid ground of distinction, between gifts over, on failure *of heirs of the body,* and on failure of *issue,* in reference to the operation of the referential construction". *Lewis on Perp.* 307.)

5. Estates tail are lawful in Great Britain, and the words *heirs, heirs of the body,* &c., have a fixed technical meaning; and, therefore, when, in that country, such words are used in an instrument of conveyance, presumptions may favor these estates. But such estates are prohibited in Georgia—these words are, by legislation, as it were, deprived of that settled signification; and therefore, presumption will not here, readily favor such estates.

6. In this case, of a bequest containing conflicting and repugnant terms, which, even by the admissions of complainants' counsel, render the testator's meaning doubtful, and which can

be determined by referential construction only, it is well to be mindful, that a construction opposed to the conclusion that an estate tail is created by the terms of this will, to a certain extent, at least, effectuates the intention of the testator—presumes, as it were, in favor of his acts, as a law-abiding citizen, and is in entire harmony with the law; whilst the result of a contrary construction, is totally to defeat the testator's intentions—is to impute to him a design to violate the law, and a consummation of that design, by the execution of an illegal last will and testament.

These are the super-added, or rather the associated, words of explanation—the qualifying and controlling terms, circumstances and considerations, which, taken in connection with the whole frame of that instrument, leave no doubt on our mind, that Jacob Wood, by his will, intended the children of his grand-daughter, if such should be born, and in default thereof, Mrs. Crawford and Mr. Redding to take the body of this property, at the termination of the life-estate in that grand-daughter, as purchasers, and not by descent.

[10.] We add that, in consideration of some of the circumstances just mentioned, and of the whole scope and purpose of this will, as it impresses us, we think that the gift upon contingency, to Mrs. Crawford and Mr. Redding, and their children, is a gift of the estate, upon the terms specified, absolutely to this lady and gentleman, and that the term children, is used as synonymous with heirs general, in this conveyance of personal estate. (2 Jarm. 73.)

It is true, that in the conveyance of property to one, and the children of another, as "to my brother A, and the children of my brother B", they all take an equal share; that is, the children take per capita with A. (2 Jarm. 111.) Blackler vs. Webb, (2 P. Wm. 383.)

But this is not the case here, and for the reason suggested, we think that Mrs. C. and Mr. R. were designed, in the event contemplated, to take an absolute estate, equally in this property.

[11.] Aided by the opinions which we have thus formed, on

the points just considered, we are conducted to the conclusion, that the legal title to the *corpus* of the property here in question, was, by the will of this testator, vested in these trustees to subserve the uses and purposes declared in the will; that the trust thus created, was a continuing trust, designed to exist until these trustees completed the arrangements contemplated by the testator, and perfected the scheme by him indicated. That, in consummation of this scheme, they were directed to make certain dispositions of different portions of his property, which are pointed out in the will; to raise the sum of fifty thousand dollars from that property—to invest the same, together with all other sums accumulating under the dispositions contemplated, in the manner directed—to pay the sum of eight hundred dollars, in semi-annual payments, to his grand-daughter, Frances T. Pierce, until the said sum of fifty thousand dollars was raised as directed : and until she should arrive at the age of eighteen, or marry, to lay out all income, above thsi sum of eight hundred dollars, at interest, until his grand-daughter should arrive at this age ; and after that, to pay to her the whole of the annual interest on, or income of this fund, during her life, the same to be taken and received by her as her separate estate, to be free from the control, and unaffected by the marital rights of any husband, whom she might at any time marry ; and that immediately after her decease, they were required to transfer or assign the body or principal of this property, and the whole and absolute interest therein, to such child or children, as she might leave at her death, conveying the share or shares, of any child or children, which might die before her, to the child or children of such deceased parent or parents, as might be living at that period ; and in default of any such children or grand-children of his grand-daughter, living at her death, the trustees were to convey or transfer the same, absolutely, to Mrs. Kitty Crawford, and her brother, Mr. Redding.

It follows, that the complainant, Frances W. Robert, had no interest in the estate, concerning which, these trustees have been called on to account. It would seem appropriate, there-

fore, that he should not be joined with her, in his relation of husband, as a party complainant to this bill. *Sigel vs. Phelps,* (7 *Sim.* 239. 1 *Molloy,* 543.) *Laird vs. Tobin. Wake vs. Parker,* (2 *Keene,* 59.) In this last case, Lord *Langdale* says, that where the husband is joined with the wife, the suit has always been considered as the husband's, and in such case, "it must be supposed to be under his influence". He adds, that "he may prosecute it in a manner not favorable to her interests". The better practice, therefore, is for her to sue by *prochein ami.*

[12.] We think, however, that an amendment might have been made, a *prochein ami* for Mrs. Robert, substituted, and the bill so modified, as to enable the latter to have and demand of these trustees, the discovery and account to which she is clearly entitled. No formal motion to amend was made, it is true, but we think that the principles of substantial justice, and the practice in Courts of Equity, authorize a Chancellor, under such circumstances, to direct an amendment, rather than to turn the parties out of Court. *Wade vs. Parker,* (2 *Keene,* 59.)

While affirming the learned and laborious judgment of the Court below, on all the other grounds, on this, we reverse it.