| 55 | 243 |
| 55 | 408 |

BLOOMFIELD STATE BANK, APPELLANT, V. H. N. MILLER
ET AL., APPELLEES.

FILED MAY 19, 1898.   No. 8045.

1. **Mortgage:** DEPOSIT OF TITLE DEEDS. A mortgage by the deposit of title deeds, without writing, is not effective in this state.

2. ———: ———. While such a mortgage is recognized in England, and while the law of England has been adopted by statute in this state, the statute does not extend to those rules of the English law which contravene the object and purpose of our own statutes.

3. ———: ———: STATUTE OF FRAUDS: REGISTRATION. A mortgage by the deposit of title deeds violates the statute of frauds and is contrary to the policy of the recording acts.

4. **Statute of Frauds:** EXCEPTION. The exception of the statute of frauds with regard to estates arising by act or operation of law does not embrace cases where the creation of the estate depends solely on the intention of parties to a contract.

5. ———: ORAL CONTRACT: EQUITY. A court of equity cannot give effect to an oral contract declared void by the statute of frauds, under pretense of aiding an imperfect attempt to execute a contract.

6. **Mortgages:** DEPOSIT OF TITLE DEEDS: EQUITY. Nor can such a court enforce a mortgage by deposit of title deeds because the loan which the deposit was made to secure has been actually received by the depositor.

APPEAL from the district court of Knox county. Heard below before ROBINSON, J.   *Affirmed.*

*A. A. Welch,* for appellant:

An equitable mortgage may arise from non-payment of purchase money, deposit of title deeds, or an unsuccessful attempt to make a valid mortgage deed. (*Gale v. Morris,* 29 N. J. Eq. 222; *Griffin v. Griffin,* 18 N. J. Eq. 104; *Hackett v. Reynolds,* 4 R. I. 512; *Chase v. Peck,* 21 N. Y. 584; *Carpenter v. Black Hawk Gold Mining Co.,* 65 N. Y. 51.)

An equitable mortgage may be created by an unsuccessful attempt to make a valid mortgage deed or to appropriate specific property to the discharge of a particular

debt. (*Peckham v. Haddock*, 36 Ill. 38; *Abbott v. Godfrey*, 1 Manning [Mich.] 179.)

A mortgage defectively executed, or an imperfect attempt to create a mortgage upon specific property for the purpose of securing a debt, will create a specific lien upon the property so intended to be mortgaged. (*Daggett v. Rankin*, 31 Cal. 321; *Love v. Sierra Nevada Lake, Water & Mining Co.*, 32 Cal. 639; *Peers v. McLaughlin*, 88 Cal. 294; *Remington v. Higgins*, 54 Cal. 620.)

An equitable mortgage may be created by deposit of title deeds of a legal or an equitable estate, as security for the payment of money, or by a conveyance legal in its form of an equitable estate for that purpose. (*Jarvis v. Dutcher*, 16 Wis. 326; *Hutzler v. Phillips*, 26 S. Car. 136.)

Right of plaintiff to equitable relief: *McCarty v. Brackenridge*, 20 S. W. Rep. [Tex.] 997; *Garland v. Wells*, 15 Neb. 298; *Read v. Morton*, 24 Neb. 760; *Van Etta v. Evenson*, 28 Wis. 33; *Swartz v. Ballou*, 47 Ia. 188; *Field v. Stagg*, 52 Mo. 534; *Drury v. Foster*, 2 Wall. [U. S.] 24; *Curtis v. Buckley*, 14 Kan. 449; *Cribben v. Deal*, 21 Ore. 211; *State v. Young*, 23 Minn. 551; *Nelson v. McDonald*, 80 Wis. 605; *Burnside v. Wayman*, 49 Mo. 356; *Chauncey v. Arnold*, 24 N. Y. 330; *McNab v. Young*, 81 Ill. 11; *Putnam v. Sullivan*, 4 Mass. 45.

Other references: *Craig v. Leiper*, 2 Yerg. [Tenn.] 193; *Polk v. Gallant*, 34 Am. Dec. [N. Car.] 410; *Mowry v. Wood*, 12 Wis. 460; *Smith v. Clarke*, 7 Wis. 468; *Boman v. Griffith*, 35 Neb. 361; *Pleasants v. Blodgett*, 39 Neb. 741; *Veith v. McMurtry*, 26 Neb. 341; *Garmire v. Willy*, 36 Neb. 340; *Savage v. Hazard*, 11 Neb. 323; *Warner v. Trow*, 36 Wis. 195.

*Carter & Brown, contra:*

The English rule that a mortgage by the deposit of title deeds may be enforced has been criticised or repudiated as being inconsistent with our system of conveyancing and registry laws, and as being in violation of the statute of frauds. (*Bicknell v. Bicknell*, 31 Vt. 498; *Shitz v. Dieffenbach*, 3 Pa. St. 233; *Thomas' Appeal*, 30 Pa. St. 378; *Edwards v. Trumbull*, 50 Pa. St. 509; *Bowers v. Oyster*, 3 P. & W. [Pa.] 239; *Probasco v. Johnson*, 2 Disn.

[O.] 96; *Bloom v. Noggle*, 4 O. St. 45; *Vanmeter v. McFaddin*, 8 B. Mon. [Ky.] 435; *Meador v. Meador*, 3 Heisk. [Tenn.] 562; *Gothard v. Flynn*, 25 Miss. 58; *Lehman v. Collins*, 69 Ala. 127; *Williams v. Hill*, 19 How. [U. S.] 246-250.)

A court of equity is bound by the statute of frauds. (*Watson v. Erb*, 33 O. St. 35; *Abell v. Calderwood*, 4 Cal. 90; *Patterson v. Yeaton*, 47 Me. 308; *Beaman v. Buck*, 9 S. & M. [Miss.] 207; *Skipwith v. Dodd*, 24 Miss. 487; *Chase v. Second Ave. R. Co.*, 97 N. Y. 388.)

IRVINE, C.

D. C. Main held a contract with the state for the purchase of the northwest quarter of section 32, township 32 north, of range 3 west, in Knox county, said land being state educational land. He also held a number of leases of other educational land in the vicinity. In 1892 he entered into contracts with H. N. Miller, which had for their effect the transfer to Miller of Main's rights to the land, payment of the consideration or a part thereof being deferred. The contract first referred to, and out of which this action arises, was assigned to Miller by a separate instrument. January 20, 1893, Miller made his note to the Bloomfield State Bank for $500, representing in part an overdraft and in part a loan made at that time by the bank to Miller. At the same time Miller wrote his name on the back of the assignment from Main to himself, and delivered the assignment in that condition to the bank, intending thereby to have it operate as security for the note. Prior thereto he had, by formal written assignments, transferred his rights to the other lands to French, to secure a debt he owed the latter. In April or May, 1893, finding that he would be unable to meet the payments to Main, Miller negotiated for the sale of his rights to Sexton, Comstock & Co. Sexton, Comstock & Co. not being prepared or not desiring to make immediate payment to Main, an arrangement was made among Miller, Main, French, and Sexton, Comstock & Co., evidenced by a preliminary memorandum agree-

ment, two formal contracts, and certain letters.   No single contract was joined in by all the parties to the transaction, but the nature of the arrangement is made plain by a comparison of the different documents.   Its precise nature is not material; its general object was to procure contracts of purchase in lieu of the leases, to pass all rights eventually to Sexton, Comstock & Co., and to this end that French should pay to Main all moneys accruing to him under his contracts with Miller, obtain the assigned contracts from Main and hold them until Sexton, Comstock & Co. should repay French his advances to Miller and to Main, when he should assign them to Sexton, Comstock & Co.   Accordingly French paid Main what was due him, including the money due on the contract first mentioned.   Down to this point neither Main, French, nor Sexton, Comstock & Co. knew of the transactions between Miller and the bank.   Learning thereof Main refused to transfer the contract with the state to French.   The bank on its part, learning of the other transactions, wrote above Miller's signature on the assignment an assignment thereof to itself.   Then it began this action against Miller, Main, and French, alleging in its petition the debt to the bank and that to secure the payment thereof Miller agreed to assign the contract with Main, that he wrote his name on the back thereof and delivered it to the bank with authority to fill in above the signature a formal assignment.   It prayed a foreclosure.   Miller made default.   French answered, denying all the material averments of the petition and alleging that for the purpose of securing title and conveying to Sexton, Comstock & Co. in accordance with his contract obligations he had bought the land of Main and paid him therefor, all in ignorance of any claim by plaintiff.   By way of cross-petition he prayed that Main be required to assign the contract to him.   Main in his answer pleaded his good faith and offered to assign to whomsoever the court might determine and to refund to French what he had paid if the court should so order.

The findings were against the plaintiff and the court ordered a conveyance by Main to French.    Plaintiff alone appeals.

By comparing the statement of facts with the issues it will be seen that neither of the contesting parties succeeded in establishing the facts precisely as he pleaded them.    The bank wholly failed to show that it had any authority to write the assignment over Miller's signature, or that the signature was placed there for such a purpose. Even if there had been such authority, the assignment was not written until after French's rights had accrued in his ignorance of the bank's.    The bank therefore can claim nothing under the written assignment.    On the other hand, French pleaded only an assignment from Main.    Main had already assigned to Miller, so that under that pleading French could claim only a subrogation to Main's right to the unpaid purchase-money, provided the bank had any right derived from Miller, although under the evidence French, or Sexton, Comstock & Co., whom he represented, was shown to have acquired Miller's rights also.    If the bank obtained no right, then it cannot complain of the decree between the other parties. If it did obtain any right from Miller, then the decree must at least be modified.    The proof showing that the written assignment to the bank was unavailing, but also showing that the contract between Main and Miller was by the latter deposited with the bank with the clear intention on the part of both that it should stand as security for a debt in part then contracted, we have thus distinctly presented for the first time in this state the question whether the doctrine of an equitable mortgage by a deposit of title deeds is sound.

It is unnecessary to review the English cases.    When the doctrine was there first announced it provoked much opposition, being justly considered a further invasion of the statute of frauds.    Lord Eldon expressed his emphatic disapproval of it, but considered the rule too well fixed in his time to justify its overthrow.    It must there-

fore be accepted as the established doctrine of the English courts, and as a part of the law of England. The common law is not with us an estate by inheritance, but one by purchase. It is here in force by virtue of statute, which provides: "So much of the common law of England as is applicable and not inconsistent with the constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory is adopted and declared. to be law within said territory." (Compiled Statutes, ch. 15, sec. 1.) No one would assert that the phrase "common law" was there used in contradistinction to the rules of equity; it undoubtedly includes the law derived from the English court of chancery. On the other hand, it was not the whole body of the English law which was adopted, but only so much thereof as is applicable (to the nature of our institutions), and is not inconsistent with the constitutions or statutes, past or future. There is certainly nothing in the constitution which conflicts with the doctrine of parol mortgages, but when we examine the statutes the question assumes a' different aspect. We have a statute of frauds in the main following the outline of the famous statute of Charles II. By this "No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, or surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same." (Compiled Statutes, ch. 32, sec. 3.) By section 4 of the same chapter section 3 shall not be construed "to prevent any trust from arising or being extinguished by implication or operation of law." By section 5 every contract for the sale of lands or any interest in lands shall be void unless the contract or some note or memorandum be in writing and signed by the party by whom the sale is made. By section 22 the term "estate

and interest in lands" shall be construed to embrace every estate and interest, freehold and chattel, legal and equitable, present and future, vested and contingent. The language of these sections is so clear that it would be immediately conclusive against the theory of parol liens were it not for the fact that much of the language is taken from the English statute, which in spite of its plain provisions the English courts straightway set themselves to evade and fritter away by a process of misconstruction as systematic as it was ingenious. For years the mischief of that policy has been realized and the danger of further pursuing it has been by most courts carefully avoided. The spirit of the statute should certainly be preserved so far as possible. Its purpose and policy no doubt is to prevent the creation or transfer of estates in or liens upon lands, except by writing, definite and complete in its terms. To enforce a mortgage created by the mere deposit of title deeds is in the plainest violation of such purpose and policy. It directly offends the very letter of the law.

Again, in this state we have created by statute a system whereby conveyances, including mortgages, must be registered in a public office. The purpose of this system is to afford security to titles by a public record which parties dealing with land may, and for their own protection must, examine, and on which they may rely. Secret transfers and liens are sought thereby to be prevented. A mortgage by deposit of title deeds tends to defeat this purpose. The recording acts have another bearing on the question. In England title deeds followed the land. The evidence of title lay not only in the delivery of a deed, but in its continued possession by the grantee. When, therefore, the owner parted with his muniments of title he parted with the means of disposing of the land. When the deposit was by way of pledge, the pledgee, by his manual possession of the deeds, had the effective power to prevent an untoward disposition of the land, either such as would defraud him or such as would de-

fraud others ignorant of his rights. But under our system it is not usual to consult or even to inquire about the original conveyances. They have performed their chief office when they have been recorded. Thenceforth the records become the practical evidence of title. By a deposit of the deeds the pledgee does not obtain that effective control over the thing pledged which is essential to such a security when not evidenced by writing, whether that thing be real or personal.

For the reasons above stated this court has held that the vendor of land, who delivers to his vendee a deed absolute, does not retain a lien thereon for the unpaid purchase-money. (*Edminster v. Higgins*, 6 Neb. 265; *Ansley v. Pasahro*, 22 Neb. 662.) In *Folsom v. McCague*, 29 Neb. 124, Judge NORVAL, speaking of an assignment of a land contract where the place for the vendee's name was left blank, said: "To make a valid assignment of these contracts, it was as necessary to have an assignee as it was the signature of the assignor. Until some one's name was filled in these blanks as assignee the appellees appeared to be and were the real owners. * * * These assignments of the contracts in blank were in violation of the statute of frauds and void." While none of these cases is decisive of that before us, they all recognize the principles already stated. We would, in the absence of authority elsewhere, say without hesitation that the doctrine of equitable mortgages by the deposit of title deeds, although a part of the law of England, is not here applicable, is contrary to our statutes, and was therefore not adopted by the legislature of the territory. This conclusion is reinforced by an examination of the decisions in other states, where by custom or by statute the common law has been acquired. For some or all of the reasons suggested the doctrine has been repudiated in the following cases: *Probasco v. Johnson*, 2 Disn. [O.] 96; *Lehman v. Collins*, 69 Ala. 127; *Bowers v. Oyster*, 3 P. & W. [Pa.] 239; *Vanmeter v. McFaddin*, 8 B. Mon. [Ky.] 435; *Bicknell v. Bicknell*, 31 Vt. 498; *Meador v. Meador*, 3 Heisk. [Tenn.] 562; *Gothard v. Flynn*, 25 Miss. 58.

While the courts of many states have to some extent intimated an adherence to the English rule it has always been on a citation of the English cases, without any discussion on principle of the objections to the enforcement of that rule in this country. Moreover, these cases are by no means so formidable as their bare citation in digests and text-books would indicate. New York invariably leads the list of states in these compilations, and the first case cited is *Jackson v. Dunlap*, 1 Johns. Cas. [N. Y.] 114. There land had been sold; the deed had not been delivered, but was retained by the grantor as security for the purchase-money. Four judges held that there had been no delivery and that title had never passed. Kent alone thought that title had passed, but that an equitable mortgage had been created. He does not discuss the question and his opinion was a dissent, but the case is cited as upholding the English rule. *Jackson v. Parkhurst*, 4 Wend. [N. Y.] 369, merely holds that an equitable mortgage is not available as a defense in ejectment. The validity of such a mortgage for other purposes was not involved in the case. *Rockwell v. Hobby*, 2 Sandf. Ch. [N. Y.] 10, was a case where a son had paid his mother's mortgage and retained an unrecorded deed to her. It was there held that the retention of the deed made an equitable mortgage, but the case loses force from the further holding that independently of the deed the son was subrogated to the rights of the mortgagee whom he had paid. *Chase v. Peck*, 21 N. Y. 581, was a case of a deed absolute; the remarks about deposits of title deeds were *obiter*.

In New Jersey a very peculiar thing has occurred. *Griffin v. Griffin*, 3 C. E. Green [N. J. Eq.] 104, was a bill to compel the defendant to surrender to plaintiff deeds to plaintiff's ancestor of land in New York. It appeared that they had been deposited as security. The court, citing the New York cases we have mentioned, took them as indicating that such a deposit operated in New York as a mortgage, and therefore very properly refused to de-

cree their surrender, without any reference to the New Jersey law on the subject. But in *Gale v. Morris*, 29 N. J. Eq. 222, the court announced the English rule as in force in New Jersey and cited *Griffin v. Griffin*, and also *Brewer v. Marshall*, 4 C. E. Green [N. J. Eq.] 537, a case where the doctrine was not involved, but mentioned by way of remote illustration of a general equitable principle. Moreover, even *Gale v. Morris* did not require a decision of the question. That was a suit to reform a mortgage on a life estate so as to embrace the fee; the mistake as between the parties was admitted, and the issue was whether a subsequent mortgagee was charged with notice so that the reformation could cut him out as to the reversion.

*Hackett v. Reynolds*, 4 R. I. 512, enforces such a mortgage in a hard case, with the preliminary observation that the fraudulent design of the debtors was so transparent "that a court of equity would be disposed to find or to make a way to thwart them." From a peculiarly apologetic tone in the opinion it is evident that the court realized that it was making a way.

*Hutzler v. Phillips*, 26 S. Car. 136, often cited as sustaining the rule, holds distinctly that the case was not within it. There was a dissent to the intimation that the rule might be in force.

The following cases, frequently cited, will be found on investigation to involve no such question, and the remarks of the judges on the subject either to be *obiter* or made for the purpose of excluding the question from the case: *Mowry v. Wood*, 12 Wis. 460; *Jarvis v. Dutcher*, 16 Wis. 326; *Abbott v. Godfrey*, 1 Mich. 179; *Peckham v. Haddock*, 36 Ill. 38; *Roberts v. Richards*, 36 Ill. 339; *Carpenter v. Black Hawk Gold Mining Co.*, 65 N. Y. 43; *Hall v. McDuff*, 24 Me. 311; *Wright v. Troutman*, 81 Ill. 374.

*Williams v. Stratton*, 10 S. & M. [Miss.] 418, says: "Such a mortgage is in direct opposition to the statute of frauds, in regard to which we have said that we will create no exceptions not found in the statute."

*Mandeville v. Welch*, 5 Wheat. [U. S.] 277, does not sustain the doctrine. Judge Story merely says in that case: "It may be admitted, that according to the course of the authorities in England, and as applicable to the state of land titles there" a deposit of title deeds creates a mortgage. Whatever inference might be drawn from that language as to the position of the supreme court of the United States is dispelled by the emphatic words of Justice Campbell in *Williams v. Hill*, 19 How. 246, "Nor can the real property conveyed in the deed be retained as security for advances or debts subsequently made, on the strength of a parol engagement."

The case of *First Nat. Bank v. Caldwell*, 4 Dill. [U. S. C. C.] 314, is entitled to more than passing consideration, not only from the eminent ability of the judge who decided it, but as being a case from this federal district and to which the law of Nebraska was applicable. There certain railroad coupons were held as a pledge. They were exchangeable for land, and by arrangement of the debtor and creditor they were exchanged, land contracts being issued in the name of the debtor but delivered to the creditor. The court held that the pledgee had a lien superior to that of a judgment creditor. Judge Dillon, however, declined to pass on the question whether a lien could be created by the mere deposit of title deeds. The fact that there they stood in lieu of coupons held in perfect pledge was the controlling fact in his mind. Giving, however, due weight to his apparent opinion in favor of the English rule, we do not feel that we can adopt it in the face of what seems to us the overwhelming reason and weight of authority against it.

The plaintiff argues that so far as the reasons urged for denying the lien are founded on the statute of frauds they are of no force because our statute excepts from its operation estates arising by act or operation of law. This phrase occurs twice in the statute—once in section 3, already quoted, and again in section 4, with reference to trusts. (Compiled Statutes, ch. 32.) The phrase is

twice found in the statute of 29 Car. II, ch. 3, and in the same connection; in section 3 in very similar words to our section 3; in section 8 with regard to trusts. Section 8 of the English statute excepts trusts arising by implication or construction of law and extinguishments or transfers by act or operation of law, while our section 4 excepts trusts arising or extinguished by implication or operation of law. It is manifest, from the closeness of context, that the phrase was used in our statute in the English sense. We have not found any exact definition thereof. Chancellor Kent, in *Simonds v. Catlin*, C. & C. [N. Y.] 346, said: "These words are strictly technical, and refer to certain definite estates, such as those by curtesy and dower and those created by *remittitur*." In Bouvier's Law Dictionary it is said that the term indicates the manner in which a party acquires rights without any act of his own. There can be no doubt that parliament intended no more than these statements imply, at least in the third section of the statute. In the eighth section trusts were involved, and the object of the exception seems to have been to avoid the destruction of the ingenious method of conveyancing derived from the doctrine of trusts and the construction which had been placed on the statute of uses, and to preserve resulting and constructive trusts. Whatever may have been the precise idea in the legislative mind, it is clear that the exception was not meant to give effect to contracts which the parties had failed to express in the form required by the statute. Such an interpretation would render the exception wholly destructive of the statute. Yet it requires that interpretation to bring this case within the exception. The lien here arises, if at all, solely from the contract of the parties. It is not a result flowing by law independent of their contract, or even derivative from any valid contract which they made.

Finally, it is insisted that a court of equity will enforce the lien as the result of an imperfect attempt to

create a legal mortgage. Certain California cases are cited in support of the argument. The power of equity is frequently asserted to reform instruments and to compel their execution under certain circumstances. But neither the petition nor the evidence presents a case for the reformation of an instrument or the specific performance of a contract. There is not made out, as suggested, a case for the specific performance of an oral contract on the ground of part performance. The plaintiff has not altered its position except by paying the consideration, and that alone is not such a part performance as will take a case out of the statute of frauds. Moreover there was no contract to specifically enforce. Miller did not promise to execute a mortgage. He indorsed the contract and delivered it, which was all that his contract contemplated. Nothing more could be required, at least where the rights of third persons have intervened. In no way can the bank be given any relief except by giving effect to a transaction which the law has denounced as void.

AFFIRMED.