JENNINGS v. AUGIR.

In re PAXSON–CADWELL.

(District Court, W. D. Washington, N. D.   July 17, 1914.)

No. 2236.

1. FRAUDS, STATUTE OF (§ 152*)—DEFENSES—NECESSITY OF PLEADING.
    The defense of the statute of frauds is unavailable, unless pleaded.
    [Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 363–366, 371, 372; Dec. Dig. § 152.*]

2. FRAUDS, STATUTE OF (§ 66*)—EQUITABLE MORTGAGE—DELIVERY OF TITLE PAPERS.
    An equitable mortgage, consisting of the delivery of unrecorded title papers by the debtor to the creditor, is not within the statute of frauds.
    [Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 107; Dec. Dig. § 66.*]

3. MORTGAGES (§ 30*)—EQUITABLE MORTGAGES—DELIVERY OF TITLE PAPERS—VALIDITY.
    Surrender by a bankrupt of an unrecorded deed to certain real property to the grantor, with a clearly shown intention to mortgage the prop-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

erty to such grantor for advances, consisting of taxes paid on the land and other claims arising out of the property, which was vacant, and therefore in the constructive possession of the grantor, constituted a valid and enforceable equitable mortgage in his favor.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 59; Dec. Dig. § 30.*]

In Equity. Action by I. H. Jennings, as trustee in bankruptcy of Paxson-Cadwell, against W. B. Augir. Judgment for defendant.

J. H. Allen, of Seattle, Wash., for plaintiff.
Byers & Byers, of Seattle, Wash., for defendant.

CUSHMAN, District Judge. Plaintiff, as trustee of the estate of Thomas J. Paxson, sues to recover from defendant, an undivided one-half interest in certain lands, alleging the delivery to defendant, more than four months prior to bankruptcy, of a deed thereto by the bankrupt, without consideration, charged to have been done in order to defraud the bankrupt's creditors, and to conceal the fact of his ownership.

The evidence shows: That in February, 1902, the defendant purchased, from the treasurer of San Juan county—half for himself, and half for the bankrupt—the property in question. That, for several years—the exact time is not definitely fixed—the defendant furnished stock for, and was interested with the bankrupt in the farming of, other lands. The record title to the land in question remained in the defendant until September, 1903, when the defendant gave the bankrupt a deed to an undivided half of it, which was never recorded. The lands are vacant and unimproved.

The defendant paid all the taxes thereon from 1903 until 1909. The bankrupt, being indebted to the defendant for such taxes and in other amounts, redelivered the unrecorded deed to the defendant and took back the following writing:

"Seattle, Washington, November 16, 1909.

"This writing certifies that I have received from T. T. Paxson, of Deer Harbor, Washington, an unrecorded deed, dated September 1, 1903, executed by me. conveying to him an undivided one-half of lots one (1) and two (2) in section nineteen (19), lots four (4) and five (5) in section twenty (20), and the northwest quarter of the northwest quarter of section twenty-nine (29), all in township 36 north, range 2 west W. M., on Shaw's Island, in San Juan county, Washington, which deed is delivered to me as a mortgage or lien upon his interest in said land to secure the payment by him of balance found due to me in settlement of account for stock, timber and use of land.

"It is understood that balance will be struck and amount owing ascertained on or before January 1, 1910, at which time said balance shall be payable on demand and bear interest at 8% per annum from said date until paid.
"Witness: [Signed] Wayland B. Augir.
"Ovid A. Byers,
"Residing at Seattle, Washington."

The defendant continued thereafter to pay all taxes on the lands up to and subsequent to the bankruptcy of Paxson. The foregoing receipt recites:

"It is understood that balance will be struck and amount owing ascertained on or before January 1, 1910, at which time said balance shall be payable on demand. * * *"

The defendant and the bankrupt did not make the contemplated settlement at the time mentioned, nor at all, before the bankruptcy proceeding. There is no evidence that the failure to settle as intended was on account of the fault or objection of either of them. During 1910, the bankrupt became further indebted to the defendant on account of sales of live stock and wool. In 1911, more than four months after all of these transactions had occurred, Paxson was adjudged bankrupt.

Nothing is shown to support the plaintiff's allegation of fraud. The defendant waives any interest in excess of 6 per cent. per annum, and asserts a lien against the property for the taxes paid by him and other items owing him from Paxson, on account of stock and timber.

[1] The determination of this cause depends upon whether the transactions constitute an equitable mortgage upon the bankrupt's interest in this land. The statute of frauds has not been pleaded against the mortgage or lien asserted by the defendant. This is sufficient to warrant a denial of its consideration. Moses Co. v. Stack–Gibbs Co., 56 Wash. 529, 106 Pac. 207.

[2] Notwithstanding that fact, the question will be considered.

"(c) As a general rule title to land conveyed does not revert to the grantor by the voluntary destruction, cancellation, or surrender of the instrument of conveyance, particularly when the rights of third parties have intervened, but there is some authority for the contention that a redelivery of an unrecorded deed with intent to revest title has by way of estoppel the effect intended.

"(d) It is held in England that on the deposit by a debtor of his title deeds as security for a loan an equitable mortgage arises which is not within the statute. The English doctrine has some following in the United States, but the more generally accepted American rule is to the contrary." 20 Cyc. 223.

The foregoing text but accentuates the fact that broad generalities have no place in ascertaining what equities are controlling in cases of complicated dealing. The English doctrine, that the deposit of title deeds with the intent to mortgage will effect an equitable mortgage, has been approved by the Supreme Court of the United States in Mandeville v. Welch, 5 Wheat. (18 U. S.) 277, 5 L. Ed. 87, and by the Circuit Court in Bank v. Caldwell, 4 Dill. 314, Fed. Cas. No. 4,798. The following also bear upon the question: Hutzler v. Phillips, 26 S. C. 136, 1 S. E. 502, 4 Am. St. Rep. 687; Dycus v. Hart, 2 Tex. Civ. App. 354, 21 S. W. 299; Mussey v. Holt, 24 N. H. 248, 55 Am. Dec. 410.

The English rule has been much condemned as frittering away the statute of frauds, but the reasoning upon which the English cases have been decided is thought to control the present case. In the United States the practice is to record instruments affecting real estate, and the law, generally, provides for making such records, and certified copies thereof, evidence. Consequently the preservation and possession of the original recorded deeds in this country signifies little. The English rule in part grew out of the fact that there the title deeds followed the land.

"In England, title deeds followed the land. The evidence of title lay, not only in the delivery of a deed, but in its continued possession by the grantee. When, therefore, the owner parted with his muniments of title, he parted with the means of disposing of the land. When the deposit was by way of pledge, the pledgee, by his manual possession of the deeds, had the effective power to prevent an untoward disposition of the land, either such as would defraud him, or such as would defraud others ignorant of his rights. But, under our system, it is not usual to consult, or even to inquire about, the original conveyances. They have performed their chief office when they have been recorded. Thenceforth the records become the practical evidence of title." Bloomfield State Bank v. Miller, 55 Neb. 249, 75 N. W. 571, 44 L. R. A. 387, 70 Am. St. Rep. 381.

[3] As long as the deed is unrecorded, and, without fraud on the part of the grantor, returned to him by the grantee—thus putting it in his power to destroy the same, and thereby greatly jeopardizing any evidence of rights thereunder, if not rendering it impossible for the grantee to establish his title—while the rule requiring the best evidence obtains, it appears clear that the reasoning upon which the English cases have been decided would apply and control.

Possession of an obligation by the promisor raises a presumption of payment or satisfaction of the promise. While lands are capable of possession, independent of the paper evidence of title, yet where, in a case such as the present, the lands are unoccupied, or in possession of the grantor, one of the major reasons for such rule, in cases concerning the possession of written obligations, would be present; that is, the intent implied from parting with the possession of the best evidence, the written instrument.

Section 8745, Remington & Ballinger's Code (title 143, § 1, Pierce's Code 1912) provides:

That "all conveyances of real estate or of any interest therein, and all contracts creating or evidencing any incumbrance on real estate shall be by deed."

This has been held to supersede the English statute, in so far as oral leases of real estate are concerned. Richards v. Redelsheimer, 36 Wash. 325, 78 Pac. 934. In Hart v. Pratt, 19 Wash. 560, 53 Pac. 711, it was held:

"Although a lease for a term of years may be required by the statute of frauds to be put in writing, a writing signed by the lessee and delivered to the reversioner is not necessary, in order to effect a surrender of the leasehold interest, if there are acts which are equivalent to an agreement on the part of the tenant to abandon, and on the part of the landlord to resume, possession of the demised premises."

In Lee v. Wrixon, 37 Wash. 47, 79 Pac. 489, it is said:

"Where parents outfitted their son for Alaska, he being without means and in debt, and paid off his debts, amounting to several hundred dollars, under the verbal promise that, if his venture was successful, he would, out of his first earnings, purchase and present them a farm for a permanent home, and in pursuance thereof, upon returning with $5,000, he purchased a farm, taking a deed in his own name, and placed his parents in possession, delivering them the deed, and agreeing to execute a deed to them, the transaction is not a gift, but amounts to an executed contract of sale, with the purchase price paid, and there is such a part performance as to take the case out of the operation of the statute of frauds. * * * And, this being so, it must fol-

low that the appellants [his parents] had an equitable title to the property the moment they entered into its possession, a title that the courts would change into a legal one by compelling the son to execute a deed conveying it to [the appellants]."

It is therefore considered that the surrender by the bankrupt of the unrecorded deed, with the clearly shown intention upon his part to mortgage the property to the defendant, reinforced by reason of defendant's continued possession—constructive though it was—the payment of all taxes for such length of time and the performance of those conditions, the consideration for the contract, are sufficient to take it out of the statute of frauds, and that the defendant has an equitable mortgage, not only for the taxes paid by him, for which he would, in any event, have a lien, by the doctrine of subrogation, but also for the other items of his claim, totaling, in all, $965.18. The circumstances and situation of the parties show that the inclusion in the lien of similar debts arising after the surrender of the deed and prior to settlement of the accounts was in contemplation.

Decree will be entered for the sale of the lands to satisfy defendant's lien thereon, and the costs of suit and sale; the excess over the amount thereof, if any, to be turned over to the complainant.