No. 20,613.

THE ARNOLD INVESTMENT COMPANY, *Appellee,* v. THE CITIZENS STATE BANK OF CHAUTAUQUA et al., *Appellants.*

SYLLABUS BY THE COURT.

BANK—*Insolvency—Trust Funds—Assets must be Appreciably Augmented.* The owner of money fraudulently obtained and used in the business of an insolvent bank, by its cashier, is not entitled to repayment by the receiver, in preference to other creditors, except so far as he shows that the assets which reached the hands of the receiver were larger by reason of such transaction than they would otherwise have been; it is not enough to show that the assets of the bank were increased, or that the money was used in reducing its indebtedness.

Appeal from Chautauqua district court; ALLISON T. AYRES, judge. Opinion filed June 10, 1916. Reversed.

*S. M. Brewster,* attorney-general, *S. N. Hawkes,* assistant attorney-general, and *T. A. Kramer,* of El Dorado, for the appellants.

*J. J. Campbell,* of Pittsburg, *Masey Holmes, Henry C. Page, Solon T. Gilmore, R. D. Brown, J. B. Pew,* and *David M. Proctor,* all of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

MASON, J.: On January 27, 1915, the bank commissioner took charge of the Citizens State Bank of Chautauqua, and shortly thereafter a receiver was appointed. It developed that the bank was insolvent, a condition obviously brought about largely at least through the fraudulent operations of its cashier, F. E. Turner. The Arnold Investment Company had purchased of Turner a number of notes and mortgages which he had forged, paying therefor in all $34,042.75. It brought an action to have the property in the hands of the receiver impressed with a trust for its benefit to this amount, on the theory that the money of which it had been thus defrauded had gone into and become a part of the assets of the bank. It recovered a judgment in accordance with the prayer of its petition, and the receiver appeals.

The question involved is whether the evidence was sufficient to support the judgment. It showed these facts: C. R. Walterhouse was cashier of the bank, owning a controlling interest, until January, 1913, when he sold out and was succeeded by Turner. Walterhouse had prior to this borrowed from the plaintiff (or from individuals who afterwards formed the plaintiff company), upon his own notes secured only by collateral which he had forged, to the amount of $25,041.08, and had sold to the plaintiff forged notes and mortgages endorsed by him, bringing the amount of his indebtedness up to $26,577.58. Turner, apparently to save Walterhouse from exposure, took care of this paper as it matured, paying the holder out of the funds of the bank. Turner then, obviously for the principal purpose of filling or concealing the shortage in the funds of the bank thus occasioned, forged a number of notes and mortgages, payable to J. M. Vandeventer (the president of the bank) and himself, and endorsed by them, the Vandeventer signature being spurious, which he sold to the plain-

tiff. Transactions of this kind, by which the plaintiff paid $1789.79, took place prior to the time (October 1, 1913) when all the Walterhouse paper had been taken care of, and after that date the plaintiff was in the same way defrauded of $34,-042.75, the amount for which it obtained judgment in this action. The plaintiff paid for the forged paper, in each instance, by depositing the purchase price in a Kansas City bank, which was the correspondent of the Citizens State Bank, "to the credit of the Citizens State Bank, for the use and benefit of J. M. Vandeventer and F. E. Turner." The Kansas City bank entered these deposits to the credit of the Chautauqua bank without qualification, holding them subject to its order, paying no regard to the designation of the beneficiaries except to repeat it in giving notice of the credit. As notice was received of each of these deposits, Turner caused an entry to be made on the books of his bank charging the Kansas City bank with the amount indicated, but no entry was ever made crediting it to Vandeventer & Turner, as would have been done if the transaction had been genuine. From time to time the fund in the Kansas City bank was increased by other items, the nature of which was not shown, and diminished by the payment of drafts issued by Turner as cashier, and other disbursements authorized by him in that capacity. When the account was closed by the receiver it had been reduced to $142.65. When the commissioner took charge the bank's cash, including credits with its correspondents, amounted to about $3800. At the time of the trial, in February, 1916, the receiver had on hand between $24,000 and $25,000 in money, $5000 of which had been collected on the cashier's official bond, and a number of notes, some good, some doubtful, and some worthless, neither the face nor the actual value having been shown.

Although the plaintiff, at the time of the surrender of the Walterhouse paper, received the bank's money in exchange for worthless securities, the transaction really amounted to its innocent acceptance from Walterhouse, in payment of his genuine indebtedness, of cash embezzled by Turner. Therefore the plaintiff's title to the money is not assailable. (*Benjamin v. Bank*, ante, p. 361; *Nassau Bank v. Nat. Bank of Newburg*, 159 N. Y. 456, 54 N. E. 66.) And since this transaction was completed before the fraud sought to be redressed

in this action was perpetrated, it can have no direct bearing upon the merits of the case. Turner's knowledge of the fraud by which he obtained the money from the plaintiff is imputable to the bank, for which he acted in accepting the proceeds. (*Peak v. Ellicott, Assignee,* 30 Kan. 156, 162, 1 Pac. 499.) The plaintiff therefore has a valid demand against the bank as a general creditor. But its claim to a preference must be denied because it has failed to trace any of its funds into the hands of the receiver. It has not proved—and indeed it has not pleaded—that the assets that came into the hands of the receiver were increased by the use that was made of its money. For anything that appears in the record substantially all the money, credits and other property held by the receiver may have been in the possession of the bank before the plaintiff bought any of the paper forged by Turner. To support its claim of priority the plaintiff was not required to show that any of the specific funds obtained from it reached the receiver, or to identify any particular property held by him as the proceeds thereof. But no recovery on that basis could be had without showing that the assets that came into the hands of the receiver were larger than they would have been but for the wrongful obtaining of the plaintiff's money. It is not enough to show that the assets of the bank were increased by the deposit to its credit of the money obtained from the plaintiff. That condition necessarily results whenever money is paid to a bank, whatever may afterwards become of it. It is not enough that what may be called the net value of the insolvent estate to be administered has been increased— that the discrepancy between the liabilities and assets is diminished—that the percentage disbursed in dividends shall be enlarged. The test is whether the money which was wrongfully obtained has been so disposed of as to increase the fund that reaches the hands of the person charged with administering the insolvent estate, to be by him distributed among the creditors. For instance, if the only assets that came into the hands of the receiver of a national bank should be the proceeds of an assessment upon the stockholders, it is clear that they could not be impressed with a trust with respect to money wrongfully converted to its use by its officers, whatever disposition might have been made of it.

The plaintiff showed that its money, after being deposited in the Kansas City bank, was paid out on the order of Turner as cashier—that it was used by the bank. But the rights of the plaintiff depend upon the particular use that was made of it. If the bank bought with it notes or other property that afterwards came into the hands of the receiver, in the original form or in some other, then to that extent the plaintiff was entitled to repayment before the declaration of any general dividend. But if it used the money to pay debts of Turner, or even to pay valid indebtedness of the bank, that circumstance does not make a preferred creditor of the plaintiff. The reason for the distinction is clear, although it has not always been regarded. Priority of payment can not be conceded to a particular creditor of an insolvent estate merely because his claim originated in a fraud practiced upon him. Such preference as he is given must be based upon the equities of the case, considering the rights of all the parties affected. If a solvent concern wrongfully appropriates the money of another to its own use the effect is the same whether it buys property with it or pays a debt. But there no question of practical importance can arise as to the trust character of the claim, inasmuch as it can be collected in full in any event. In the case of an insolvent concern, however, the situation is entirely different. If the money misappropriated reaches the hands of the custodian who administers the estate, in its original form or in any other—that is, if the assets in his hands are thereby increased by the amount fraudulently obtained—the fund can be restored to the lawful owner and no one will be any worse off than if the transaction never had occurred. Restitution is made to the person defrauded, no one else is injured, and the original status is restored as to every one concerned. The transaction is simply undone, the result being the same whatever complications may have ensued, provided it is possible to establish that the fund to be disbursed has been made that much larger by reason of the wrongful obtaining of the money. But if the money is used to pay in full a claim against the insolvent, the claimant who receives the payment gets more than he is entitled to, at the ultimate expense of the other creditors, if full restoration be made of the misappropriated fund. Here the capital stock of the bank was $10,000. When it was looted of

Investment Co. v. Bank.

$25,000 to protect the forgeries of Walterhouse it of course became insolvent. For the purpose of illustration, let us assume that prior to this time its liabilities to creditors were $50,000 and its assets $60,000, so that on liquidation it could have paid its creditors and stockholders in full. Then by the embezzlement of $25,000 the stock was rendered valueless and each claim was subjected to a discount of thirty cents on the dollar, the aggregate of $50,000 in claims being reduced in actual value to $35,000. If in that situation the $30,000 (to use a round number) wrongfully obtained from the plaintiff were used to pay claims against the bank, its total indebtedness was thereby reduced to $20,000. If in such circumstances the receiver should now pay the plaintiff's claim in full, there would remain but $5000 to be distributed among depositors or other creditors, as innocent as the plaintiff of wrongdoing or neglect, who had parted with $20,000, and who, if the transaction between Turner and the plaintiff and the bank had never taken place, need have lost only thirty per cent of their investment, instead of seventy-five per cent. The fact that other creditors may have reaped a corresponding advantage, to which they were not entitled, affords no justification for inflicting this additional loss on their less fortunate associates.

The fund into which the misappropriated money must be traced (that is, the fund which must be shown to be larger by reason thereof than it would otherwise have been) in order that a preference may be allowed, is the fund derived from the property that is still on hand when the system is instituted of dividing the remaining assets of the insolvent among creditors in proportion to their demands. The defrauded claimant is entitled to receive from that fund just what he can show that he contributed to it, and no more. He need not show that it is made up of the very specie obtained from him, nor need he be able to show that any particular portion of it resulted from the fraud practiced upon him. But he must show that it is larger by the amount of his claim than it would have been except for his contribution.

With respect to the views just stated there is little real difference of judicial opinion. Such as there is appears to arise less from a want of agreement upon the principles that

27—98 KAN.

should control than from a lack of uniformity in their application, and especially from the failure to keep in mind the distinction between an increase in the assets of an insolvent business as a going concern, and an increase in the assets that reach the hands of the person charged with winding up its affairs; between, on the one hand, preserving assets although changing their form from money to credit or to specific property, and, on the other, dissipating them by paying dollar for dollar on claims that should have been subjected to a discount. A majority of the court failed to give effect to this distinction in *McLeod v. Evans, Assignee, etc.*, 66 Wis. 401, 28 N. W. 173. The same result was afterwards reached, in part at least, through the influence of that decision, in *The Davenport Plow Co. v. Lamp*, 80 Iowa, 722, 45 N. W. 1049; in *Capital Nat. Bank v. Coldwater Nat. Bank*, 49 Neb. 786, 69 N. W. 115; and in *Carley v. Graves*, 85 Mich. 483, 48 N. W. 710. But the Wisconsin case was afterwards overruled (*Nonotuck Silk Co. v. Flanders*, 87 Wis. 237, 58 N. W. 383), as were the other cases cited (two of them expressly and one by implication), so that in each of the four states named the law on the subject under discussion is now administered in accordance with the generally accepted rule, as it has already been stated (*Bradley v. Chesebrough*, 111 Iowa, 126, 82 N. W. 472; *Fire & Water Com'rs v. Wilkinson*, 119 Mich. 655, 78 N. W. 893; *State v. Bank of Commerce*, 54 Neb. 725, 75 N. W. 28; *City of Lincoln v. Morrison*, 64 Neb. 822, 90 N. W. 905). In *Myers v. Board of Education*, 51 Kan. 87, 32 Pac. 658, this court cited with approval the earlier Wisconsin case, but in later decisions the distinctions referred to have been noted and given effect, as shown by these quotations:

"A trust is not imposed on the assignee unless the funds of the plaintiff actually came into his hands in their original form, or commingled with the estate, or had been used by the assignor to swell and increase the estate which passed by the deed of assignment. *Myers v. Board of Education*, 51 Kan. 87, 32 Pac. 658; *Hubbard v. Irrigation Co.*, 53 Kan. 637, 36 Pac. 1053. This case, unlike any other that has been considered by this Court, rests on the bare presumption that the money came into the hands of the assignee because it had been received by the assignor a short time before the assignment, and had never been repaid to the plaintiff." (*Burrows v. Johntz*, 57 Kan. 778, 782, 48 Pac. 27.)

"The fund itself, or something into which it has gone and which stands as its representative, must be on hand, subject to identification,

Investment Co. v. Bank.

and separable from the general assets, in order to charge the assignee with the trust; or, if the fund has been so commingled with the general assets as to be incapable of identification or tracing, the estate which came to the assignee must have been augmented or bettered, in an appreciable and tangible way, in order to charge it with the trust. The mere saving of the estate by the discharge of general indebtedness otherwise payable out of it, or by the payment of the current expenses of the business, is not an augmentation or betterment of the estate, within the meaning of the rule." (*Insurance Co. v. Caldwell*, 59 Kan. 156, 158, 52 Pac. 440.)

"In some of the cited cases the doctrine of the impressibility of insolvent estates with trusts was carried to the full length, and language is used which, taken apart from the facts in the cases, might give countenance to a rule that if the trust fund had been used by the trustee even for the payment of his general indebtedness, and without increasing the estate which passed to his assignee, it would be sufficient to charge the whole estate with a trust. . . . [Quoting the foregoing excerpt from *Insurance Co. v. Caldwell*.] . . . From the testimony, it appears to us that the trust fund went into and enlarged the assets of the bank, and that it was a part of the estate which passed into the hands of the receiver, and is, therefore, a charge upon it." (*Bank v. Bank*, 62 Kan. 788, 794, 797, 64 Pac. 634.)

The principle by which the case is controlled is well settled, and a further review of the authorities is not regarded as necessary. (See, however, *Lowe v. Jones*, 192 Mass. 94, 78 N. E. 402, annotated in 116 Am. St. Rep. 230; Note, 15 L. R. A., n. s., 1100; Note, 86 Am. St. Rep. 802-807; *Empire State Surety Co. v. Carroll County*, 194 Fed. 593, 604, 605; *Clinton M. & M. Co. v. T. Co. of N. A.*, 35 S. Dak. 253, 151 N. W. 998.)

The portion of the judgment awarding the plaintiff priority of payment is reversed, and the cause is remanded with directions to render judgment for the defendants on that issue.