STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V. FARMERS STATE BANK OF POLK, APPELLANT: LEWIS S. LOOMER, INTERVENER, APPELLEE.

FILED JULY 17, 1931. No. 27377.

*C. M. Skiles* and *I. D. Beynon,* for appellant.

*H. G. Wellensiek, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

ROSE, J.

In a proceeding to wind up the affairs of the Farmers State Bank, an insolvent banking corporation, Lewis S. Loomer intervened and presented a petition for the allowance of $3,350 as a preferred claim payable in full out of the general mass of assets in control of the receiver. The answer to the petition of intervener was a general denial. A trial of the issues resulted in a judgment granting intervener the relief prayed. The receiver appealed to the supreme court.

The decision is controlled by the opinion in *State v. Farmers State Bank, ante,* p. 532.

AFFIRMED.

PAINE, J., concurs in the result.

EBERLY, J., dissenting.

To the application of the principle announced by this court in *State v. Farmers State Bank, ante,* p. 532, as controlling in the two companion cases of the same title, one

wherein Freeman E. Runquist et al. are interveners, and one in which Lewis S. Loomer is intervener, we again respectfully dissent.

These are companion cases. The facts in the Runquist case are so interwoven with the case first referred to as to present identical questions of both law and fact. The *Loomer* case involves the same general considerations. But, in addition to general propositions common to the three cases, the *Loomer* case involves important matters peculiar to itself.

Each of these cases is concerned with the proper administration of our state bank act, and the true effect of the decisions announced by the majority of the court, to which we have heretofore dissented, as well as the decision in the instant case, may only be fairly measured by the express terms of banking legislation in the light of the public policy which that controlling enactment evidences and the course of events which have occurred both before and since its enactment. The statutory terms are alike peremptory to courts of equity as well as law. In this dissent we confine our comments in the main to the *Loomer* case.

Originally adopted by the legislature of 1909 (Laws 1909, ch. 10), "For the regulation, supervision and control of the business of banking" and providing penalties, the Nebraska state bank act marked a distinctive departure from what had theretofore been the established policy of the state. Though the original act has been the subject of numerous important amendments, from time to time, so far as involved in this case its fundamental public policy remains, essentially unchanged. This legislation was clearly the result of social and economic conditions and developments which furnished a legislative reason for the state's intervention in behalf of the depositor class.

It will be remembered that state banking institutions existing at the time of the original adoption of the act under consideration here, as elsewhere, had flourished and

grown because of certain indispensable services they performed in the business world. These services involved the function of the deposit, the exchange, the loan, and to a limited degree the fiduciary or trust relation. This business was generally recognized as quasi-public in its nature, and that the public good was necessarily involved in its successful operation. *Noble State Bank v. Haskell,* 219 U. S. 104; *Shallenberger v. First State Bank,* 219 U. S. 114.

So, also, it was fully appreciated that the function of the deposit was then, and ever since has continued to be, first and preeminent in importance, because it prepares the basis for all other operations carried on by the modern bank. It is indeed a truism that banking institutions can prosper, and properly serve their communities, only when they possess the confidence of depositors, who on this basis entrust them with their funds, and which in turn empower the banks to supply the legitimate loan demands of their customers. While the ratio of bank capital to bank deposits necessarily varies in each institution, we know, speaking generally, the latter is two, four, six and even twenty fold the former.

It is obvious that it was, and still is, of utmost importance that the depositors in the state banks of this state should have satisfactory assurance that at the appointed time of repayment their deposited funds would be forthcoming and their ultimate safety at all times be unquestioned. This indeed is the only possible basis that there could be certainty that, during recurring seasons of financial stress and uncertainty, crippling withdrawals would not be made, disastrous alike to customer and bank.

To accomplish these important purposes the act of 1909 provided in part: "The claims of depositors, for deposits, and the claims of holders of exchange, shall have priority over all other claims, except * * * and * * * shall at the time of the closing of a bank be a first lien on all the assets of the banking corporation from which they are due and thus under receivership, * * * and, upon proof thereof,

they shall be paid immediately out of the available cash in the hands of the receiver." Laws 1909, ch. 10, sec. 52.

This act also created a guaranty fund, as an additional measure of safety for the depositors and holders of exchange, and to whose right of "first lien" this guaranty fund, upon payment by it of such claims, succeeded by virtue of statutory subrogation.

It is important, however, to note that this statute imposes no additional duties or responsibilities on either the depositors or holders of exchange. The depositor still had no voice in the selection of the officers and agents of the institution that carried his deposit. Its business transactions and business policies were not submitted to him for either information or approval. He possessed no powers of visitation or inspection or examination. He still was confined to doing business on the outside of the bank counter, and all transactions of his bank, save with himself, remained, as before, to him a sealed book.

In view of the relation of its depositors to the business involved, as well as the preponderating contributions necessarily required of the depositor class as a prerequisite to its successful and effective prosecution, the situation suggests that the basic principle on which the bank act is framed is clearly analogous to, if not wholly identical with, that which our artisans', laborers', mechanics', and materialmen's lien acts exemplify, and should receive the same favorable construction. At the very least, fairness would indicate that "It is presumed, as well on the ground of good faith as on the ground that the legislature would not do a vain thing, that it intends its acts and every part of them to be valid and capable of being carried into effect." 2 Lewis' Sutherland, Statutory Construction, sec. 497. Therefore in the enforcement of this act no presumption can be followed or indulged in which necessitates on the part of, or exacts from, the depositor that which the act by its terms does not afford him power to have.

So the state in its sovereign power has written the terms

of this statute in the contracts of the depositors with its banks. Its faith stands pledged for the honest enforcement thereof, as fairly understood by common men when they become a party to its terms, and in honest reliance thereon part with the products of their toil; and no condition can justly be imposed to the prejudice of their rights but such as are contemplated by the law, or provided for therein.

And it cannot be gainsaid that bank customers, other than depositors and holders of exchange, employing its services, and securing the benefits of its functions, likewise well understood the situation and the mandate of the law—the preferences the law awarded the depositors. Their engagements with the institution were entered into with full knowledge that in the event of insolvency the assets of the bank would be first for the liquidation of demands other than their own. This is the fundamental basis of the entire business as carried on since the passage of this law by state banks. "Equity follows the law." The fundamental basis involved must be respected, complied with, and conformed to by equity when its powers are invoked to settle and adjust the complicated transactions of bank customers when insolvency has intervened.

These conclusions are in harmony with all our decisions, until the last. DEAN, J., in delivering the opinion of this court in *Abie State Bank v. Weaver*, 119 Neb. 153, affirmed in 282 U. S. 765, says in part: "The paramount object, and clearly the legislative intention in the creation of the depositors' bank guaranty fund law (of which the lien provisions here in controversy are an essential part, and of the fund created thereby an important source), was first for the protection of the depositors' money in the state banks." And, as to the duty of courts in enforcing its provisions, also said: "It is elementary that it is not within the province of the courts to annul a legislative act unless its provisions so clearly contravene a provision of the fundamental law, or it is so clearly against

public policy, that no other resort remains." This decision does not stand alone. For more than twenty years this court has consistently sustained the provisions of this act, and preserved the preferences accorded depositors, substantially unimpaired.

Notwithstanding the situation set forth, and the consistent action of this court in heretofore fully sustaining the same, in the case now under discussion, as well as in the two to which reference has already been made, a majority of this court has now actually and effectually, by construction, not only in effect overruled a consistent line of precedents of this court, relating to trust funds, of more than twenty years standing, but has set aside and annulled the mandate of this statute awarding to depositors in insolvent banks a "priority over all other claims, * * * and * * * a first lien on all the assets of the banking corporation from which they are due." Laws 1909, ch. 10, sec. 52. This was done notwithstanding the words last quoted may fairly and well be said to have entered into and become and, so long as the statute remains unrepealed at least, remain an integral part of all the contracts of the depositors with the Farmers State Bank of Polk. This action was taken by a majority of this court advisedly in the determination of a claim arising out of, and incidental to, engagements entered into and had between claimant and the bank and its officers, not involving deposits or exchange, and constituting no part of legitimate banking, and with complete knowledge on the part of claimant of the prior vested rights of depositors. The judgment in this, as well as the judgments in the other two companion cases, in effect deny the statutory first lien of the depositors, and appropriate more than $8,850 of admitted assets of the Farmers State Bank of Polk to the payment of claimants making no pretentions of being depositors or entitled to preference under the terms of the state bank act.

This express violation of the clear, unambiguous terms

of the statute, the necessary reversal of the public policy, evidenced thereby, and the substantial impairment of rights of contract vested thereunder, inevitably invoke the challenge, "By what authority?" The majority have not made use of names or labels and in their opinion have ignored the existence of judicial landmarks. Even notwithstanding the wholly inconsistent and repugnant character of their pronouncement, they have refrained from expressly overruling the many prior decisions of this court in conflict therewith.

Still, in view of what the majority opinion expressly approves, in connection with what is said therein, it is plain that they construe the facts in the case now before us to entitle the claimant therein to an "equitable lien," and to have the same enforced against all the property and effects of the insolvent bank to the exclusion, so far as may be necessary, of the claims of depositors, as a charge or lien senior and superior to the statutory declared "first lien" of the latter. The following definition of the term "equitable lien" is submitted in connection with the statement just made: An equitable lien is a right not recognized at law, and which a court of equity recognizes and enforces as distinct from strictly legal rights, to have a fund, or specific property, or the proceeds, applied in full or in part to the payment of a particular debt or demand; a right of a special nature to or over property which constitutes a charge or incumbrance so that the property itself may be proceeded against in an equitable action or the holder thereof be required to account therefor, or the proceeds thereof.

To epitomize, it may be said that the position of the majority of this court is that, upon the concurrence of the six elements as hereafter set forth, a claimant, not a depositor, is entitled to an equitable lien or preference, viz.: (1) Where a state bank as trustee unlawfully converts and sells the trust property, and (2) deposits the proceeds to its own use without authority, and (3) mingles indistin-

guishably (such unlawfully converted proceeds) with the general mass of bank assets which are thus augmented, and (4) uses such converted trust funds in the regular course of banking business, and (5) fails to execute the trust or return the trust funds to the beneficial owner, and (6) (insolvent) goes into the hands of a receiver, the beneficiary may resort to equity to charge the mass and restore the trust fund as a preferred claim payable in full from "(all) the general assets." His claim is thus determined as a matter of equity senior and superior to the statutory lien of the depositor thereto and without respect to the source of the assets involved, or the fact that they may be nonliquid in character and purchased and wholly paid for by the trustee bank with untainted money long prior to the conversion claimed.

Preliminary to further discussion, it may be said that "augment" is authoritatively defined as, "To enlarge in size; to swell; to increase." 6 C. J. 862.

The following constitutes a summary of the transaction to which the majority opinion, without any discussion, applies the conclusion as determinative principles necessitating the interposition of an equitable lien in behalf of Loomer, which by judicial fiat it not only creates, but makes senior to the mandate of the statute.

The record here discloses, without question, that on and prior to August 27, 1928, the Farmers State Bank of Polk was, and had been, in serious financial difficulty. It also appears that this was but a continuation of a preexisting condition. At some time prior to the date mentioned, the definite date of which the record does not afford, this institution's original capital, due to impairments, had been reduced from $30,000 to $25,000—the irreducible minimum provided by law. Comp. St. 1929, sec. 8-122. In addition, the stockholders had already once replaced an impaired capital to the extent of a voluntary stock assessment of 100 per cent., which had been fully paid in by them. However, these steps wholly failed to remedy the

situation, and on August 27, 1928, according to claimant's evidence, "We (the bank) were low on reserve, and we needed more money." They had barely a 5 per cent. reserve at this time. The state banking department had directed that $21,000 of their bills receivable be charged off as bad paper. The record does not disclose that this institution then had any net surplus or net undivided profits. The extent of the actual impairment then existing of the assets of the bank may be judged from the fact that the board of directors then adopted the plan of securing the payment of another, and the second, voluntary 100 per cent. assessment on outstanding stock. Claimant Loomer during all this was the duly elected, qualified, and acting, vice-president of this bank, and also a member of its board of directors, and thereafter continued to officiate in such positions. It is quite evident that this plan to restore the impairment of the capital stock was Loomer's. He testifies that he made the motion to adopt it which was agreed to by the board. This plan provided in substance that this voluntary assessment should be paid by the stockholders in four equal payments, viz., cash 25 per cent., balance in equal amounts on January 1, 1929, July 1, 1929, and January 1, 1930; notes being given to the bank for deferred payments by stockholders who did not have the cash, among whom was Loomer. Beyond question Loomer and others approved this plan, accepted it, and acted on it. The members of this board of directors, who as stockholders owned approximately $20,000 of the outstanding stock substantially on the day of the adoption of this plan, largely complied with it by delivering the necessary funds and obligations to the bank. Loomer himself drew his check in payment of the cash instalment required, and executed and delivered to the Farmers State Bank of Polk, of which he was then vice-president and director, three promissory notes in the sum of $1,650 each to cover the deferred payments. Loomer contends that the agreement between all parties was that none of the funds

and obligations thus delivered were to be at the disposal of the bank until all stockholders had responded in like manner. But on the happening of that event all of the funds, obligations and promissory notes were without further action of stockholders or directors to become the property of the bank and subject to its immediate disposal. The undisputed testimony of the executive officer of this bank, with reference to the Loomer transaction, is: "The bank was accepting his notes as his payment of the assessment when the assessment was to be consummated." It seems that certain of the stockholders failed to comply with this voluntary assessment and failed to make the payments required thereby. In the meantime on October 13, 1928, it appears that the executive officers of the bank indorsed and transmitted two of the three notes executed by Loomer to one of the bank's correspondents, which discounted the same and credited the proceeds to the account of the Farmers State Bank of Polk. This entire amount was thereafter paid out and exhausted by the correspondent bank while the Polk bank was still a going concern, and no money therefrom was in any form traced back to it, or to any specific assets in its possession when taken over by the state on October 30, 1928. Loomer, so far as shown by the present record, gave the matter no further attention, took no further steps to restore the solvency of his bank, and permitted it to continue as a going concern, at least with his tacit approval. He claims now that the use of his two notes by the bank was wholly without authority and constituted an unlawful conversion thereof, of which he insists he had no knowledge until long after the bank was taken over, in an admitted wholly insolvent condition, on October 30, 1928. There is no evidence in the record disclosing the amount of losses, if any, between August 27 and October 30, nor is any intervening change in the bank's financial situation between the two dates referred to shown. The record as an entirety fairly sustains the inference of a state of continued insolvency

of the bank between the two dates inclusive, which the members of the board of directors well knew, or should have known. On this record the claimant in effect asked for, and by the majority opinion has been awarded, a preference in derogation of and superior to all lawful depositors' "first liens" on the admitted assets of the bank. It may further be said that claimant's brief admits, and indeed it stands undisputed in the record, that no part of this "converted trust fund" has been traced to any particular property, or identified in any specific or identified asset which was taken over by the receiver of this bank, and that the evidence substantiating the facts here summarized is either claimant's own evidence or evidence introduced in the record without objection on his part.

In the light of the situation outlined, the first question suggested by the tendered challenge to the authority assumed by the majority relates to the source from whence is derived legal principles—the law—the existence of which the opinion assumes and by which it is sought to sustain the award made. It is to be remembered that laws are not the creation of courts but are the enactments of the legislative department of state. To legislate is constitutionally forbidden the judiciary. Const. art. II, sec. 1.

There can be no sustainable claim that constitutional mandate or statutory provision authorizes or sustains the judgment approved. Therefore, if the principles essential to sustain this decision actually have existence and being as valid, substantive law, they must be derived from, and have their source in, the common law of England, and from that portion thereof formerly administered in the English chancery courts. In other words, their origin must be clearly identified with "a certain portion of the substantive law" of England, which convenience has named "equity," and which is administered only by those courts which are known as courts of equity. Even if this be accomplished, their validity and existence in this state is

wholly the result of legislation which now appears as section 49-101, Comp. St. 1929, which reads as follows: "So much of the common law of England as is applicable *and not inconsistent* with the Constitution of the United States, with the organic law of this state, or with *any law passed or to be passed by the legislature of this state,* is adopted and declared to be law within the state of Nebraska." (Italics ours.)

With reference to this enactment, Irvine, C., whose judicial learning has ever remained unchallenged in the traditions of this tribunal, in delivering the unanimous opinion of this court, with reference to the statute just quoted, says: "The common law is not with us an estate by inheritance, but one by purchase. It is here in force by virtue of statute, which provides: (Here is quoted the exact words of section 49-101, above referred to.) No one would assert that the phrase 'common law' was there used in contradistinction to the rules of equity; it undoubtedly includes the law derived from the English court of chancery." *Bloomfield State Bank v. Miller,* 55 Neb. 243, 248. This conclusion is in accord with the unanimous judicial opinion throughout the nation. 12 C. J. 183; *Goodman v. Carroll,* 205 Ala. 305; *Continental Guaranty Corporation v. Peoples Bus Line,* 31 Del. 595; *Campbell v. Colorado Coal & Iron Co.,* 9 Colo. 60; *Robert v. West & Reid,* 15 Ga. 122; *Beall v. Surviving Exr's of Fox,* 4 Ga. 404; *In the Matter of Pennock's Estate,* 20 Pa. St. 268; *Marks v. Morris,* 14 Va. 463.

As to this statute, this court is further committed to the doctrine: "Any provision of the common law of England that is inconsistent 'with any law passed or to be passed by the legislature of this state' is not made the law of this state by section 3697, Rev. St. 1913 (Comp. St. 1929, sec. 49-101)." *Moran v. Moran,* 101 Neb. 386. See *Bishop v. Liston,* 112 Neb. 559.

As already stated, our state bank act was adopted originally in 1909. Its terms were carried into, and substan-

tially reenacted as, article 16, title 5, ch. 190, Laws 1919, as a portion of the Administrative Code. As to subjects of legislation covered therein, it was at the time of its original adoption and, notwithstanding amendments subsequently made thereto, thereafter continued to be a valid enactment, independent and complete within itself. That as such, if in conflict with, or repugnant to a prior statutory enactment not mentioned therein, or in conflict with and repugnant to any provision of the common law of England in force in this state, or adopted by virtue of section 49-101, Comp. St. 1929, all of such prior laws are thereby repealed, superseded or modified to the extent at least that the former is repugnant to, inimical, or in conflict with such prior laws. *State v. Hevelone,* 92 Neb. 748; *In re Heirship of Robinson,* 119 Neb. 285.

There is no uncertainty as to the actual facts of the three transactions. Unquestionably the property involved constituted bank assets. The nature and source of these, as already discussed and determined, bring these cases squarely within the clear, unambiguous words of the banking statute. The long established rule of construction as to the effect of complete and independent legislative acts upon prior existing laws, whether the common law or prior statutes, is conclusively against the contentions of the claimant herein. Whatever equity, considered as a certain portion of our substantive law, might have authorized or sustained prior to the adoption of the state bank act, when that fact occurred, its provisions and powers were then fronted by the conflicting and repugnant provisions of the last valid expression of legislative intent; what formerly obtained was thereby, and thereupon *ipso facto,* to the full extent of such conflict or repugnancy, repealed and annulled. The plain words of the last enactment must control.

"The court will not read into a statute exceptions not made by the legislature." *Siren v. State,* 78 Neb. 778; *State v. School District,* 99 Neb. 338.

It is only when a statute is ambiguous that it is subject to judicial construction. But when the language is plain, clear and unambiguous, it is not subject to construction or interpretation; this court has no power to amend a statute, and any attempt to give it any other than its plain meaning would be judicial legislation. *Chicago, B. & Q. R. Co. v. Amack*, 112 Neb. 437.

"It is not within the province of the court to set aside, or nullify by construction, an act of the legislature which is free from ambiguity, and clear and explicit in its terms, upon the ground *that to do so would appear equitable;* nor upon the theory that, in the judgment of the court, the legislature made a mistake and did not intend to do that which its language clearly imports." (Italics ours.) *State v. Bratton*, 90 Neb. 382.

Indeed, the construction which the authorities referred to unquestionably sustain is but the required application of a general rule, whose origin is coeval with the establishment of equity, viz.: "Where they are inconsistent and incompatible with each other, a statutory lien excludes and repudiates an equitable lien." 37 C. J. 309.

This court also is fully committed to the doctrine of the controlling effect of statutes whose terms conflict with previously existing equitable rights, principles and liens, as to the subject-matter covered by such statutes. This question was early presented in the history of this tribunal and fully and decisively determined in our vendor lien cases. "The principle on which a vendor's lien is generally regarded as resting is one of natural justice, that one who gets possession of the estate of another ought not in conscience be allowed to keep it without paying the consideration, although other grounds, such as the presumed intention of the parties, or the existence of a trust between them, have been assigned." 39 Cyc. 1789.

As an equitable doctrine, it was admittedly well established in England from the earliest times, and owed its existence there wholly to "that certain portion of (Eng-

lish) substantive law" which is usually denominated "equity." But this equitable doctrine could not be harmonized with our statutes relating to real estate. As an instance, section 50, ch. 73, Comp. St. 1881, provided: "Every conveyance of real estate shall pass all interest of the grantor therein, unless a contrary intent can be reasonably inferred from the terms used." A retained interest or right in or to real estate vested in the vendor, either legal or equitable, after conveyance made, was plainly repugnant to statutory words quoted and plainly wholly inconsistent therewith. Without such retention there could of course be nothing upon which any action either legal or equitable could be based. Accordingly this court was early committed to the view that: "The doctrine that a vendor has a lien on the land conveyed for the purchase money remaining unpaid is repugnant to our statutes in relation to real estate, and is no part of the law of this state." *Edminster v. Higgins*, 6 Neb. 265. See *Rhea v. Reynolds*, 12 Neb. 128; *Ansley v. Pasahro*, 22 Neb. 662; *Bloomfield State Bank v. Miller*, 55 Neb. 243.

The conclusion inevitably follows that our bank act, a valid statute as to all matters within its purview, supersedes and invalidates all substantive equitable principles and provisions, as well as the terms of prior statutes in conflict therewith or repugnant thereto; and that the majority opinion is, without reference to the correctness of their conclusions otherwise, wholly unsustainable as being in direct contravention of the positive terms of a valid statute. 1 Story, Equity Jurisprudence (14th ed.) 69; *Albright v. Albright*, 228 Pa. St. 552; *Dorner v. School District*, 137 Wis. 147; *Rambo v. First State Bank*, 88 Kan. 257; *Allen v. Kitchen*, 16 Idaho, 133; *Hayes v. Schall*, 229 Mo. 114; 3 Stephen, Commentaries on the Laws of England (15th ed.) 418.

It is suggested in the opinion that rules this case that, if the bank act authorize the receiver to appropriate any part of intervener's trust funds to the claims of the gen-

eral depositors, it will prevent the chancery powers conferred on the district courts by the Constitution of the state, and be therefore void.  The suggestion is wholly without force as applied to the facts or controlling law presented here.  No funds or property of the trustee is here involved.  In brief and argument claimant admits that not a dollar of his trust funds have been traced to any one of the many separate assets now before this court. So, too, the Constitution denies to courts of equity as well as law the power to legislate.  Const. art II, sec. 1.  Neither can a court of equity create new rights not before existing at law, and then take jurisdiction to pass on and enforce them because the law affords no remedy.  *Henderson v. Hall,* 134 Ala. 455; *Harper v. Clayton,* 84 Md. 346; *Madison v. Madison Gas & Electric Co.,* 129 Wis. 249; *Holmes v. Millage,* 1 Q. B. (Eng.) 551.

We now advance to further analysis of the intrinsic merits of the pronouncement sponsored by the majority in this case.  Fairness demands that the correctness of the judicial doctrines therein expressed be determined by applying thereto the test of the accepted principles of equity, in the light of the course of events occurring both before and since the adoption of our state bank act, and not forgetting the actual facts of the situation, and according due weight to the fundamental basis and real nature of the business involved.  We have before us in strictness a statutory procedure equitable in its nature.  The opinion under consideration treats the litigation and expresses its conclusions as the determination of a case in equity.  It is obvious as the transactions are here presented the maxim, "Equity looks through forms to substance," is applicable without limitation.  *Texas v. Hardenberg,* 10 Wall. (U. S.) 68; *Dodd v. Wilson,* 4 Del. Ch. 114; *Stockton v. Central R. Co.,* 50 N. J. Eq. 52; *Weckerly v. Taylor,* 77 Neb. 886; *Fenton v. Tri-State Land Co.,* 89 Neb. 479.  So, too, we are here dealing with a wholly insolvent institution, and not with a solvent, going concern.

Bank control by stock is ended. The corporate entity is immaterial. The real contest and the real parties in interest are lawful depositors, not as creditors enforcing an indebtedness, but as lienholders enforcing liens, opposed to claimants who are asserting, not claims against the bank, but claims to the property thereof.

Recurring now to the consideration of the "six points" on which the majority opinion rests, and by which it must be sustained or fall, in a court of reason, and considering first conformity to the result of the transaction, as it is mirrored by the evidence before us, we respectfully submit that the assumptions of the opinion are entirely negatived by the undisputed facts of the record, and therefore the "six points" never concurred. It never happened.

For instance, the "third" essential point of the statement is: "mingles indistinguishably (such unlawfully converted proceeds) with the general mass of bank assets," etc. The evidence sustaining this statement is not referred to in the opinion. The record discloses no witness testifying to it. It does not exist.

In this connection, it is to be remembered that the bill of exceptions before us carries no complaint as to the absence, incorrectness, or insufficiency of the records of the insolvent bank involved. These records in Nebraska are kept under the supervision of the secretary of the department of trade and commerce, under provisions of law requiring such records to be kept "for the purpose of keeping accurate and convenient records of the transactions and accounts of such bank." Comp. St. 1929, sec. 8-102. While these bank books were not introduced in evidence, the testimony in the record relating to their contents tends to sustain the presumption of their correctness and sufficiency.

It appears, as we have already seen, that the two Loomer notes were "unlawfully converted" as the result of a transaction had on the 13th day of October. This bank was taken over by the state on the following 30th of Oc-

tober. The mingling time was therefore restricted to a period of but seventeen days.

As courts are supposed to know and take cognizance of the economic conditions prevailing in their jurisdiction, we may be authorized to add that we are here dealing with a bank of "frozen" assets.

After a careful study of this record in the light of circumstances involved, we have arrived at the conclusion that they contain not the slightest evidence of any "indistinguishably mingled" assets ever reaching the possession of the receiver of this bank. We challenge the majority to name or identify a single asset in possession of this bank when taken over by the state that may truthfully be said to answer that description, or the name of any witness whose testimony establishes that fact.

It must be admitted that property of banks is composed of physical objects and values evidenced by physical things. To "indistinguishably mingle" implies a mixture of elements whose identity has been wholly lost. Its accomplishment inevitably necessitates (1) parties who did it; (2) a time when; (3) and place where it occurred; and (4) the location of the mingled and mixed elements at the time and place where the identities were lost. We assume as a proper application of the principle of the law of evidence that "courts take notice of the general course of the banking business and the common and well-known methods and practices of banks." 7 Ency. of Evi. 936. We assume that, speaking generally, the statement is fully justified as a fact of common knowledge that, ordinarily, excluding real estate which because of its nature has a situs of its own; the great mass of bank property is contained within its banking house. In view of the fact that no evidence was adduced by the parties in the trials below, save and except as to credits with its correspondent banks, that indicates the presence of assets of this bank at any other place than its banking house, the circumstances of the records fully justify the conclusion that the only place where this

bank's assets could have been "indistinguishably mingled," assuming that were possible, was at this selfsame banking house. According to the undisputed evidence it did not happen there or elsewhere, and we are quite convinced that as a physical fact it could not happen anywhere. Under the circumstances of this case, the very nature of the items to be mixed, and their precise identification by the records of the institution, if properly kept, renders that result impossible. For we know, in the light of the principle stated, the property usually possessed by state banks may be classified as "real estate," "other real estate," "bills receivable," "bonds," "judgments," "exchange," "available funds," viz., cash on hand and balances due from solvent banks. This classification embraces, excepting the result of accident, practically all of the assets of any of the smaller, rural banks. Certain it is, we are fully justified by common knowledge in the conclusion that "real estate," and "other real estate," "bills receivable," "bonds," and "judgments" constituted the "great mass of bank assets" this bank possessed. When we visualize the situation and note that "real estate" in banking parlance is the banking house long owned and paid for; that "other real estate" comprises distinct tracts of land, each description of which has a situs, unchangeable, of its own and necessarily involving specific contracts and conveyances, all bearing definite dates with actual persons as parties thereto; that "bills receivable" comprise promissory notes, and other like instruments of indebtedness, but each bearing an identifying number; that "bonds" carry on their face like indicia of identification; that "judgments" each are essentially "unmixable" and fully disclose on their face the sources of the indebtedness merged into them; and when, in addition to the identifying facts enumerated, there is added thereto a proper set of bank records, whose keeping was supervised by the state, and presumably complying with the statutory mandate "that accurate and convenient records of all transactions" shall be kept, and by the way the

sufficiency and completeness of which is unchallenged in this record, the statement that the trust funds herein sought were "indistinguishably mingled" with any of the assets just enumerated is opposed to the physical facts, reason, and common sense.

But two elements of the classification of the possible assets of this bank remain for consideration, viz., "exchange" and "available funds." The latter of course includes actual cash possessed by the bank at its banking house and the amounts due it from its correspondents. The amount of actual cash on hand when this institution was taken over by the state was $1,817.51. There is no evidence of any *exchange* among the assets. It is true money may be "indistinguishably mingled" with money. But in this case the "mingling" must have occurred in the banking house, and to it not a dollar of the proceeds of claimant's converted notes has been traced by the evidence. If indeed it be conceded that the $1,817.51 in the banking house was the results of "mingling" or "mixture," it was wholly distinct from and in no manner mixed with, other bank property. Its condition would afford not the slightest justification for removing almost $10,000 of the depositors' money, wholly untainted, from the assets of this bank.

The conclusion inevitably follows that the basis on which the majority opinion proceeds is wholly without support in evidence or in fact. It also contravenes every principle of public policy evidenced by the state bank act.

The statutory "first lien," created and declared as attaching to all the assets of a bank, in its very essence is superior to rights based upon personal liabilities of the bank created by the stock control, while operating the same. This state bank act did not contemplate, nor will an enlightened public policy permit, vain demands to be made upon the depositor, nor the fundamental basis of his relation to be departed from. In justice the bank act, and equity enforcing the same, can exact no more from the

depositor to sustain his statutory preference in tact than that same law provided for his and its protection. Therefore, in a court of honest conscience, lawful depositors guilty of no wrongs are not chargeable with the frauds of a bank operated by its stock control, nor responsible for its peculations, nor are they to be prejudiced by its breaches of trusts. These conclusions are not only in strict accord with the legislative intent, clearly appearing in its expressed terms, but also are necessarily implied from the provisions of our state bank act. They are also in harmony with the trust fund doctrine as applied by our court in modification of the rights of general creditors of insolvent trustees at the time of the enactment of this statute and which had prevailed in this jurisdiction consistently without interruption since the decision of *State v. Bank of Commerce* (1898) 54 Neb. 725, reaffirmed in *City of Lincoln v. Morrison,* 64 Neb. 822.

Even against a mere general creditor unaided by a statutory lien, it had then been determined, and was the unquestioned law of this state in 1909, that: (a) Misappropriation of a trust fund does not entitle the *cestui que trust* merely as such, for that reason alone, to a preference over the general creditors of an insolvent trustee. (b) Property or assets of the insolvent trustee acquired before, or with the proceeds of property held before, the trust money came into his hands, and not in any way mingled therewith, are not subject to any lien of claim of the *cestui que trust,* and the rights of the latter in respect thereto are those of a general creditor. (c) The burden of tracing the trust fund into an existing asset is on the *cestui que trust.* (d) Even if it is proved that the trust fund has been but recently disbursed and has been used to pay debts that otherwise would be claims against the estate, there would be manifest inequity in requiring that the money so paid out should be refunded out of the assets, for in so doing the general creditors whose demands remain unpaid are in effect contributing to the payment of

the creditors whose demands have extinguished the trust fund. *State v. Citizens State Bank*, 117 Neb. 358.

The rule of statutory construction seems to be that, when the facts in any given case require the application of the terms of the bank act to trust funds, they should be construed in the light of the principles quoted, and which were unquestionably the controlling precedents in this jurisdiction at the date of its enactment; and indeed for this purpose they would disregard any subsequent decisions in effect overruling the same or altering or modifying the rules therein announced. The controlling principle is that the act must be read in the light of the existing state of the law at its adoption. 36 Cyc. 1137; 26 Am. & Eng. Ency. of Law (2d ed.) 632. In the light of this principle of statutory construction, to now accord to the depositors' first lien on all the assets of the bank a construction restricting its scope as to assets covered to less than that accorded the claims of general creditors at the time of the adoption of the state bank act would indeed be a manifest absurdity. But in the majority opinion in the instant case the principles quoted, as announced in the precedents referred to, are wholly ignored and utterly disregarded, though not expressly overruled. And on a record in which claimant admits failure and inability to trace the trust funds involved to any specific assets, and in no manner establishes the mingling of trust funds therein, the majority have appropriated of the insolvent bank's property (all of which was acquired before the trust money came into its hands, or with the proceeds of property held before) the sum of $8,850 and more of the admitted assets of the Farmers State Bank of Polk, in utter disregard of the first lien of its depositors thereon.

Not only has the plain mandate of our written law been ignored, or rather judicially emasculated, and the uniform course of judicial decisions of this tribunal been disregarded, but likewise the course of events of the past decades has been given no consideration whatever. In that

time millions have been deposited in state banks by depositors relying in perfect good faith on the provisions of the state bank act, read in the light of the decisions we have quoted. Certain state banks, through no fault of these depositors as a class, have failed. On December 31, 1928, there were unpaid claims of depositors against state banks in receivership and also state banks operated by the guaranty fund commission, of which the instant bank was one, in the aggregate amounting to $26,400,282; that the total sum of assets to be realized would be $10,451,932, leaving $15,948,350 as a deficit. Dean, J., in *Abie State Bank v. Weaver, supra.* Additional failures of state banks since that date have increased the total claims of depositors and have not reduced the estimated deficit. The rule announced in the instant case in effect changes the law as it has existed for more than twenty years, impairs every depositor's contract with an insolvent state bank, and prejudices his rights of recovery of his just demands. This conclusion is unescapable. At best his only assurance of final liquidation was his first lien on the assets of his immediate bank of deposit, to which was added certain contributions to be made from certain assessments of the guaranty fund, and certain relief to be afforded by the "depositors' final settlement fund." Now the instant decision diminishes the available cash assets in this receivership, at the time of the entry in the trial court, by 33 1/3 per cent. This in turn in like degree increases the demands of the depositors of this bank upon the funds already named as the source of relief to all state bank depositors, and in proportion diminishes the total sum possible to be received by each therefrom. The iniquities of the decision live not alone in the evil precedent, which the future only can measure, but are visited directly to and upon every depositor in insolvent state banks whose own assets fail to pay 100 per cent. to them they owe.

This sad situation necessarily resulting from the overthrow by the majority opinion of a line of cases, well

reasoned and long followed as binding precedents, suggests again the inquiry: Conceding the power, what in law or morals can justify and sustain those responsible for its creation, by their retroactive pronouncement which, in fact if not in law, impairs contracts and divests rights long possessed and exercised? I answer only to quote the supreme court of the United States in a case involving the effect of the judgment of the supreme court of a state reversing a long line of decisions, in reliance on which contracts had been made, which employed the following language: "However we may regard the late case in Iowa as affecting the future, it can have no effect upon the past. 'The sound and true rule is, that if the contract, when made, was valid by the laws of the state as then expounded by all departments of the government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent action of legislation, or decision of its courts altering the construction of the law.' The same principle applies where there is a change of judicial decision as to the constitutional power of the legislature to enact the law. To the rule, thus enlarged, we adhere. It is the law of this court. It rests upon the plainest principles of justice. To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal." *Gelpcke v. City of Dubuque,* 1 Wall. (U. S.) 175, 206.

So, also, here are the words of a great judge, addressed to the vital subject now before us, who long ago departed this life and whose memory lingers as a benediction with those who truly love the law: "When a principle of law is established by a long series of decisions, without a single case on the other side, to carry it out in plain good faith is as sacred a duty as any judge has to perform. His notion that it ought to be otherwise is not entitled to a moment's consideration. It is no part of our office to tinker at the law, and patch it up with new materials of our own making. Suitors are entitled to it just as it is.

Bad laws can be borne; but the *jus vagum aut incertum*—the law that shifts and changes every time it passes through the courts—is as sore an evil and as heavy a curse as any people can suffer, and no people who are fit for self-government will suffer it long. Even a legislator, if he is wise and thoughtful, will make no change which is not absolutely necessary. Legislative changes, however, are prospective, and disturb nothing that is past. But judge-made law sweeps away all the rights which may have been acquired on the faith of previous rules. For such wrongs even the legislature can furnish no redress. When the scales of justice are shaken by the hands that hold them here, there is no power elsewhere to adjust them. * * * But 'new lords, new laws,' is the order of the day. Hereafter, if any man be offered a title which the supreme court has decided to be good, let him not buy if the judges who made the decision are dead. If they are living, let him get an insurance on their lives; 'for ye know not what an hour may bring forth.' The majority of this court changes, on the average, once in every nine years, without counting the chances of death and resignation. If each new set of judges shall consider themselves at liberty to overthrow the doctrines of their predecessors, our system of jurisprudence (if system it can be called) would be the most fickle, uncertain, and vicious that the world ever saw. A French Constitution, or a South American republic, or a Mexican administration would be an immortal thing in comparison to the short-lived principles of Pennsylvania law. The rules of property, which ought to be as steadfast as the hills, will become as unstable as water. To avoid this great calamity I know of no resource but that of *stare decisis*. I claim nothing for the great men who have gone before us on the score of their marked and manifest superiority; but I would stand by their decisions because they have passed into the law and become part of it, have been relied upon and acted on, and rights have grown up under them which it is unjust and cruel to take

away." 2 Veeder, Legal Masterpieces, 930.

In view of the dire consequences necessarily entailed by the action of the majority of this court in this case, it would seem that the only possible justification therefor would be that the "results" following would in the future mark a definite forward step in the progress of jurisprudence. It must be admitted such a culmination would indeed be the only possible excuse or extenuation for the wrongs the decision inevitably inflicts.

An analysis of this opinion discloses that, after eliminating the positive provisions of the state bank act from consideration, it disposes of it by the application of certain "general principles of equity," as defined and applied therein. Compare its pronouncement with *McLeod v. Evans* (1886) 66 Wis. 401. Every reason advanced in the Nebraska opinion has its counterpart in the Wisconsin decision. The Wisconsin case is a three-two decision. The dissenting opinion by Justice Cassody states grounds relied on by the minority judges in the instant case. While in the Nebraska case personal notes were involved, and in the Wisconsin case the converted item was a draft, yet in both the proceeds of the converted paper were traced into correspondent banks where credit was given the trustee banks, which was in turn disbursed by such correspondents. The real substantial issue determined was therefore identical. The majority in Wisconsin pronounced the same decision as made by the majority in the instant case. So, too, it may be said that this doctrine was thereafter adopted in a number of western states. But subsequent events discovered the inherent vice of the doctrine set forth in *McLeod v. Evans, supra*, and in *Nonotuck Silk Co. v. Flanders*, 87 Wis. 237, the reasoning upon which the *McLeod* case was based was repudiated, and the decision itself expressly and formally overruled on the distinct ground, not alone that the rule was inequitable, but because "it is very important to the people of the state that this court should, at least on such questions, adhere to the

principles of the common law so well established as to become elementary. It is especially essential that the state and federal courts on such questions should be in harmony."

As years passed, it may be noted that the courts of substantially all the states that adopted the doctrine of *McLeod v. Evans, supra,* materially receded therefrom. This was accomplished in part by limitations and qualifications of the original declaration, and many indeed expressly overruled the cases whereby its doctrine was accepted. A number of these cases are collected at page 482 of 115 Nebraska. It may be said now that not a single jurisdiction, outside our own, sustains the theory and application of the majority opinion. The legal history of Iowa is typical of the states that receded from the rule announced in *McLeod v. Evans, supra.* It is summarized by the supreme court of that state in *Leach v. Iowa State Savings Bank,* 204 Ia. 497. See, also, *Andrew v. State Bank of New Hampton,* 205 Ia. 1064; *Leach v. Burton & Co. State Bank,* 206 Ia. 675; *Arnold Investment Co. v. Citizens State Bank,* 98 Kan. 412; *Rugger v. Hammond,* 95 Wash. 85.

The sober truth is that the action of the majority has not placed this court in the position of leadership in the march of judicial thought. It marks retrogression to an exploded concept of almost half a century ago, which some courts have tried, and all trying have rejected it as unjust, save alone ourselves.

As already suggested certain features of this *Loomer* case are not common to the two companion cases. While the majority have ignored their existence, we submit they ought to preclude recovery in a court of conscience.

The entire situation as outlined by the evidence in this case carries with it the unescapable inference, which the record as an entirety in no manner rebuts, that this institution was insolvent on August 27, 1928, and that the directors then knew or should have known it. The facts before us indicate that claimant Loomer owed certain

duties to this trust which he failed to perform. He was an executive officer and a director during the entire period. It was his duty to know the system of management, and its daily working, including the general financial condition of the bank and all important matters in its dealings. 1 Michie, Banks and Banking, 268; *Merchants Bank v. Rudolf*, 5 Neb. 527.

When these directors were informed of the bank's precarious condition in August, 1928, they were required to give closer attention to its affairs. *Ford v. Taylor*, 176 Ark. 843.

Indeed, the claimant, as to depositors in his bank, occupied substantially the position of trustee, and was liable to them for losses occurring through mismanagement, neglect of duty, or abuse of trust; it is sufficient to show that he has been guilty of a breach of the implied obligations arising out of the nature of his position. 1 Michie, Banks and Banking, 272.

"When a director discovers that the bank is insolvent and fails to take such steps as lie in his power to close the bank for business, and takes part in any arrangement which permits the bank to be kept open, and deposits to be received, he is personally liable for damages to a depositor who is ignorant of the insolvency, and whose deposits were thereafter received. His plain duty, upon discovering the insolvency of the bank, is to call a meeting of the board of directors, or communicate with the superintendent of the banking department, or direct the cashier to discontinue the taking of deposits, or warn individual depositors of such insolvency, and for a failure to perform such duty, an action will lie against him personally." 1 Michie, Banks and Banking, 359.

The above is a fair statement of the obligations of a director of a state bank, in the absence of a statute which either expressly or by implication modifies the same. In Nebraska such a statute exists. By its terms "the claims of depositors * * * shall have priority over all other

claims * * * and * * * shall at the time of the closing of a bank be a first lien on all the assets of the banking corporation from which they are due." Comp. St. 1929, sec. 8-1,102. Under this provision, after insolvency intervened, every item of assets disposed of, every dollar paid out, whether to general creditor or to stockholder, was an irreparable loss to the owners of the deposits remaining therein. For it is undeniable that if an insolvent bank have deposits aggregating $10,000, equally divided between five depositors, with assets aggregating $5,000, each depositor will suffer a loss of 50 per cent. If after insolvency intervenes two depositors are paid in full, the net loss of the unpaid depositors will be 83 1/3 per cent. If, however, the $4,000 be paid to a general creditor, not a depositor, the net loss will now amount to 90 per cent. The only possible method of protecting the depositors' first recourse to the assets was to retain them by the prompt closing of the bank. To permit it to be thereafter conducted as a going concern was to unavoidably subject the rights of the depositor to all losses incident thereto, which necessarily included those caused by the mistakes, errors, frauds, and peculations of the officers and agents in immediate charge thereof.

Loomer's duty as a director was plain, and it is equally plain that he wholly failed to perform it. By his connivance and consent his insolvent bank continued as a going concern, and he thereby furnished the opportunity for the loss of which he complains, and which his own negligence as a director directly permitted. He who comes into equity must come with clean hands, and will not be permitted in a court of conscience to recover on a cause arising out of his own wrong. But this maxim also excludes recovery because of a situation already fully disclosed by the evidence introduced on behalf of the claimant, which we will now discuss. It is to be remembered that Loomer was not only at all times material a director, but he was also at the same time an executive officer of this bank. The trans-

action in which the notes that constitute the foundation of his claim were given by him involved and contemplated that on its completion there would be a debtor and creditor relation between Loomer and his bank, evidenced by the notes, and that the "available funds" would be decreased by the aggregate of the notes. It was a transaction plainly within the inhibition of section 8-149, Comp. St. 1929, which provides: "No officer * * * of any corporation transacting a banking business under this article shall be permitted to borrow any of the funds of the bank, directly or indirectly. * * * Any officer * * * of a corporation transacting a banking business under this article, * * * who shall violate the provisions of this section, or who shall aid, abet or assist in a violation thereof, shall be deemed guilty of a felony," etc. Loomer's own statement in the record fully discloses that, in connection with the two notes, every possible act on his part necessary to a completed criminal transaction was performed. His sole complaint here is that the bank took possession of the notes and sold them, and appropriated the proceeds prior to the happening of a condition, whose performance was wholly dependent on others. But conceding that no crime was actually wholly committed under the provisions of the statute referred to, still criminality remains. For the statute also provides: "If two or more persons conspire to commit any felony * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties in such conspiracy shall be fined not more than ten thousand ($10,000) dollars or imprisoned in the penitentiary not more than two years, or both." Comp. St. 1929, sec. 28-301. See *O'Bryan v. State,* 111 Neb. 733. In other words, a conspiracy is a combination of two or more persons by some concerted action, to accomplish some criminal or unlawful purpose, or *to accomplish some purpose not in itself unlawful by criminal means.* In the instant case, so far as the restoration of the dissipated capital of the Farmers State Bank of Polk was contemplated by the plan adopted, it was a

lawful purpose, but the accomplishment of this purpose, as contemplated by this same agreement by the use of the vice-president's notes to the bank, in effect creating a debtor and creditor relation between him and the corporation of which he was then an officer, involved a criminal conspiracy to secure a result not in itself criminal by the use of criminal means. Indeed, when this unlawful agreement was entered into by him and others, and Loomer had illegally executed and delivered the notes to his bank pursuant thereto, and in all things complied with the terms of the criminal agreement, plainly the conditions of the statute as to, "and one or more of such parties do any act to effect the object of the conspiracy," have been met and criminality is complete. The fact that the conspiracy fails in its object, without any opposing volition exercised by the parties thereto, in no manner affects the guilt of those who participated therein.

"The conspiracy, however fully formed, may fail in its object, however earnestly pursued; the contemplated crime may never be consummated; yet the conspiracy is none the less punishable." *United States v. Rabinowich*, 238 U. S. 78. See *Williamson v. United States*, 207 U. S. 425.

There is no question, at least in this jurisdiction, that "Courts will not, even with the consent of the parties, enforce an illegal contract, and will of their own motion take notice of illegal contracts which come before them for adjudication and leave the parties where they have placed themselves." 13 C. J. 507. See *Wilson v. Parrish*, 52 Neb. 6; *Wilde v. Wilde*, 37 Neb. 891.

"No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim. The rule is expressed in the maxims, '*Ex dolo malo non oritur actio*,' and, '*In pari delicto potior est conditio defendentis*.' The law in short will not aid either party to an illegal agree-

ment; it leaves the parties where it finds them. The general rule is the same both at law and in equity, and whether the contract is executory or executed." 13 C. J. 492. See *Sunderland & Saunders v. Hibbard,* 97 Neb. 21; *Perry v. Berger,* 85 Neb. 753; *Haurigan v. Chicago & N. W. R. Co.,* 80 Neb. 139; *Johnson v. Owen,* 72 Neb. 477; *Jorgensen v. Kingsley,* 60 Neb. 44; *Storz v. Finklestein,* 46 Neb. 577; *Clarke v. Omaha & S. W. R. Co.,* 5 Neb. 314; *Davis v. Hinman,* 73 Neb. 850.

The proposition that the execution and delivery of the notes by Loomer, then vice-president and director of the payee bank, under the circumstances constituting the transaction, constituted a deliberate and known violation of his implied duties and obligations as director, was wholly without authority in law, and opposed to the public policy of the state, as evidenced by the plain terms of the public statutes relating thereto, may not be contraverted. No power or legal right was vested in him that in any way, or to any degree, authorized the act expressly proscribed and punished by the criminal laws. The same restrictions rested on both the bank as a corporate entity, and the executive officers who acted in its behalf. Not by the wildest stretch of the imagination could this entire transaction be conceived as legitimate business, in which any of the parties thereto, either corporate or natural, might lawfully engage. Eliminate all consideration of the state bank act, still the long-established principle of the common law would deny recovery to the prejudice of the lawful depositor and creditor. For the principle is well established, and long accepted, that "The claims of depositors and other general creditors who trusted the bank in the transaction of its legitimate business may be preferred over claims which originated in the conduct of a business, by the bank, in which it had no legal authority to engage." 1 Michie, Banks and Banking, 592. See *Bank of Chattanooga v. Bank of Memphis,* 56 Tenn. 408; 7 C. J. 752; *State v. Bank of Hemingford,* 58 Neb. 818.

With this last analysis we close this story of "equity" with earnest dissent. We protest that the "great mass of assets" of the modern rural bank is not "indistinguishably" intermixable as oil, or grain, or sand, but is comprised of elements each separate and distinct, which may be identified; that the basis assumed by the majority opinion, unsupported by the evidence, never existed in this case, and in its essentials is what every banker knows to be at variance with the facts of modern banking; that to now, through forms of judicial power, withdraw from the lawful priority and first right of depositors, legislatively declared, judicially approved, and by such depositors relied on, a "mass of property" as "indistinguishably mingled" and mixed with trust funds unlawfully converted, when time, and place, and inherent nature thereof proclaim the same or any distinctive part or parts thereof to be unmixed and unmingled, and incapable of so being, involves both untruth and moral wrong that admitted good faith and unquestioned integrity of judges may not justify, excuse or extenuate; that this court has retrograded and again accepted a long-abandoned and outworn concept of equity coeval with a bygone age; that it now denies the enforcement of the just and fair terms of a valid statute and thereby visits afflictions on unfortunate owners of more than twenty-six millions of deposits in insolvent state banks, and adds to their misfortunes others wholly created by this court. And lastly, with sublime disregard for the valued maxims, this court of conscience has degraded equity and has required her as a handmaiden to serve the malefactor and for him to secure the fruits of his transgressions. Truly of such the prophet spake: "And judgment is turned away backward, and justice standeth afar off: for truth is fallen in the street, and equity cannot enter." Isa. 59:14.

GOOD, J., concurs in the dissent.